**In re TOWNE SERVICES, INC. SECURITIES LITIGATION.**

**Civ.A. No. 1:99–CV–2641–BBM.**

United States District Court, N.D. Georgia, Atlanta Division.

June 4, 2001.

---

Daniel L. Berger, Steven B. Singer, Robert S. Gans, Gerald H. Silk, Javier Bleichmar, Bernstein, Litowitz, Berger & Grossmann, New York City, Martin D. Chitwood, Lauren S. Antonino, Christi A. Cannon, Neal S. Berinhout, Jeffrey H. Konis, Chitwood & Harley, Atlanta, GA, Bruce G. Murphy, Law Offices of Bruce G. Murphy, Vero Beach, FL, Jack Reise, Abraham Rappaport, Maya Saxena, Robert R. Adler, Milberg, Weiss, Bershad, Hynes & Lerach, Boca Raton, FL, Steven G. Schulman, Samuel H. Rudman, Russell J. Gunyan, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, for Thomas J. Golab, James E. Bolen, Stephen Crain and Joel C. Powers.

Sylvia K. Kochler, Scott Michael Ratchick, Shanon R. Jackson, Hunton & Williams, Lance Parks McMillian, Nelson, Mullins, Riley & Scarborough, Geoffrey Hammond Cedarholm, III, Denise Arenth Miller, Miller & Martin, Atlanta, GA, for Towne Services, Inc., Drew W. Edwards, Henry M. Baroco and Bruce F. Lowthers.

### ORDER

MARTIN, District Judge.

This case comes before the court on the motions to dismiss brought by Defendants Towne Services, Inc. ("Towne"), Drew Edwards, Bruce Lowthers, and Henry Baroco [Doc. Nos. 32–35]. For the reasons that follow the motions are GRANTED in part and DENIED in part.

### I. *Background*

This action alleges violation of Section 11 of the Securities Act of 1933 (codified as amended at 15 U.S.C.A. § 77k) and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated pursuant to Section 10(b) of the Securities Exchange Act of 1934 (codified at 15 U.S.C.A. § 78j). It concerns the content of representations about Towne, including a prospectus and registration statement filed in connection with a secondary public offering of Towne common stock, a press release and public filing concerning Towne's earnings, and statements to investment analysts. The plaintiffs' are individual shareholders of Towne who purport to bring this action on behalf of the class of persons who purchased Towne common stock between June 23, 1999, and October 13, 1999 (the "class period"), including a subclass of persons who purchased Towne common stock "pursuant to" the prospectus mentioned above. The defendants are Towne itself and Drew Edwards, Henry Baroco, and Bruce Lowthers, who were, respectively, Towne's Chief Executive Officer, President, and Chief Financial Officer during the alleged class period. This case was initially filed as two separate actions, styled *Golab v. Towne Services, Inc. et al.* (No. 99–CV–2641) and *Bolen v. Towne Services, Inc. et al.* (No. 99–CV–3067), which have been consolidated. The plaintiffs filed a consolidated amended complaint, and this motion to dismiss followed.

Towne provides electronic financial services to its customers, who are principally small businesses. The focus of the case is representations made during the second and third fiscal quarters of 1999. The central allegations are that: (1) when Towne's secondary public offering began

on June 23, 1999, Towne failed to disclose disruptions to its data lines in early June and resulting customer losses; (2) when Towne announced its earnings for the second quarter of 1999, it failed to disclose that a significant proportion of its earnings were derived from a one-time software sale, allegedly outside the ordinary course of Towne's business; and (3) when Towne met with investment analysts in September 1999, it inaccurately represented to them that Towne was "on track" to meet third quarter earnings estimates. The plaintiffs maintain that these omissions and/ or misrepresentations amount to securities "fraud," or are otherwise actionable under federal securities law.

## II. *Discussion*

### A. *Rule 12(b)(6) standard for dismissal*

■ Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal for "failure to state a claim upon which relief can be granted." The standard for evaluating such motions is very generous towards the pleading party, and dismissal may not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). If matters outside the pleadings are presented, Rule 12(b) ordinarily requires that the motion be treated as one for summary judgment, which, in turn, will usually require that the plaintiff be permitted to conduct discovery before responding to the motion. This rule, however, is subject to certain exceptions, which have become somewhat involved in the context of securities litigation.

To begin with, the Eleventh Circuit has approved the practice of taking judicial notice of public filings with the United States Securities and Exchange Commission ("SEC") underlying allegations of securities fraud. *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1275–81 (11th Cir.1999). The *Bryant* court grounded judicial notice of SEC filings in Federal Rule of Evidence 201(b), which authorizes courts to take judicial notice of a fact "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See* 187 F.3d at 1277. The *Bryant* court made clear, however, that such judicial notice is "for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents." *Id.* at 1278. In connection with their motion to dismiss, the defendants have submitted and rely upon the following documents filed by Towne with the SEC: (1) the prospectus and registration statement for Towne's secondary public offering ("SPO"), which became effective on June 23, 1999, and (2). Towne's Form 10–Q for the second quarter of 1999, which was filed on or around August 16, 1999. In their response, the plaintiffs also submit the following SEC filings: (1) the 1999 annual report (Form 10–K) for Towne Bancorp, Inc., filed on March 31, 2000; and (2) Towne's Form 10–Q for the first quarter of 1999, filed on May 7,1999. The court takes judicial notice of these SEC filings.

The defendants have also submitted and rely upon the following documents that were not filed with the SEC: (1) a September 1, 1999, article about Towne in the *Wall Street Journal* (sometimes referred to hereinafter as the *WSJ* article); (2) Towne's press release concerning its earnings for the second quarter of 1999, which was made available on August 9, 1999; (3) an August 17, 1999, article about Towne in the *Atlanta Journal–Constitution;* and (4) Towne's October 13, 1999, press release concerning an expected shortfall in estimated results for the third quarter of 1999.

These documents are referred to or relied upon in the plaintiffs' complaint.[1] The *Bryant* court left open the issue of whether, or to what extent, such documents may be the subject of judicial notice on a motion to dismiss. *See* 187 F.3d at 1280 n. 16.

There is support in the case law, however, for considering evidence outside the pleadings in connection with a motion to dismiss if the evidence is specifically relied upon in the complaint and its contents are not in dispute. *See Harris v. Ivax Corp.,* 182 F.3d 799, 802 n. 2 (11th Cir.1999) ("[A] document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute."); *see also In re Theragenics Corp. Sec. Litig.,* 105 F.Supp.2d 1342, 1348 (N.D.Ga.2000). Moreover, with respect to the safe harbor exemption for "forward-looking statements" codified in 15 U.S.C.A. § 78u–5(c), Congress has specifically instructed the court to consider, on a motion to dismiss, any "statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." *Id.* at (e). As the statutory language makes plain, this provision is not limited to statements in publicly-filed documents; any statement "not subject to material dispute" will do (for the purposes of evaluating the safe harbor).

Based on this authority, the court takes judicial notice of the non–SEC documents appended to the defendants' motion to dismiss. The plaintiffs have not raised any issue concerning the authenticity of these documents. As noted above, *Bryant* made clear that a court can take judicial notice of SEC filings on a motion to dismiss only to establish that particular statements were or were not made, not for the truth of any such statements, *Cf. Harris,* 182 F.3d at 802 n. 2 ("The usual rules for considering 12(b)(6) motions are thus bent to permit consideration of an allegedly fraudulent statement in its context."). The same limitation applies with equal (if not greater) force to judicially-noticed materials not filed with the SEC. Accordingly, the court takes judicial notice of these documents to the extent they establish the content of statements attributed to the defendants, but not for any other purpose.

### B. Allegations of the Consolidated Amended Complaint

The allegations of the complaint, as amplified or clarified by the statements within the judicially-noticed documents, are as follows. Towne provides electronic services to its customers that allow them to automatically process payment and sales information through Towne's computer systems. Towne was founded in 1995 and became a public company in 1998. Its stock is traded on the NASDAQ. On June 23, 1999, seven days before the end of its 1999 second quarter, Towne made a secondary public offering ("SPO") of its common stock. In connection with this SPO, Towne filed a prospectus and registration statement (the "Prospectus") with the SEC.[2] Towne sold 4.5 million shares of common stock in the SPO, at a price of $7.125 per share, generating proceeds of more than $30 million.

The complaint alleges that at the time of the SPO, Towne was experiencing problems with its computer systems and network infrastructure. In particular, the complaint alleges that Towne's systems

---

1. *See, e.g.,* Consolidated Amended Class Action Complaint ("Complaint") at ¶¶ 5, 7, 8, 58, 63, 65, 68–70, 74.

2. The Prospectus is attached as Exhibit B of the Appendix to Towne's memorandum in support of its motion to dismiss. It is cited herein as "Prospectus at _____."

had experienced a disruption on or around June 7, 1999, in connection with a relocation of Towne's headquarters. During this disruption, Towne's system shut down completely for some period of time. The complaint attaches a number of ominous adjectives to the problems Towne was experiencing, such as severe, pervasive, serious, significant, extraordinary, intractable, widespread, and substantial. *See, e.g.,* ¶¶ 4, 38, 39, 48.[3]

As a result of these system failures, Towne lost customers during the second quarter. The scope of these losses likewise is characterized by the complaint in dire terms, such as massive, extraordinary, and substantial. *See, e.g.,* ¶¶ 4, 48, 53. The article in the *Wall Street Journal* contains an admission by a Towne representative that customer losses were "higher-than-usual" in the second quarter, and were linked to the disruption in early June. (The importance of this corroboration is explained below).

The Prospectus was declared effective seven days before the end of the second quarter. The Prospectus did not reveal or comment on Towne's loss of customers during the second quarter, nor did it mention the disruption of data lines as a result of Towne's relocation. Concerning Towne's computer systems, the Prospectus stated the following:

> Our computer processing system stores data redundantly at both the customer terminal location and at our processing center and in a secure environment. Potential service interruptions are minimized by hosting the client's data on multiple servers and locations so that no single hardware failure would result in service interruption. In addition, we keep mirror servers on location, create daily digital backup tapes and store them in fireproof safes and maintain a full "hot-site" backup processing center

at another location separate from our main processing center. We believe that our system configuration and disaster recovery measures adequately protect us against system failures that may occur due to destruction of our processing center, natural disasters, bomb threats or other loss or impairment of our network capabilities.

Prospectus at 41. The Prospectus also provides the following warning about the extent to which a problem with Towne's computer systems could affect its business:

> **Our business depends on our network infrastructure and computer equipment, the failure of which would hinder our services and may make it more difficult to conduct our business.**
>
> Our operations depend on our ability to protect our network infrastructure and equipment. Damage to this equipment may be caused by human error, natural disasters, power and telecommunications failures, intentional acts of vandalism and similar events. Despite precautions we have taken, the occurrence of human error, a natural disaster or other unanticipated problems could halt our services, damage network equipment and result in substantial expense to repair or replace damaged equipment. In addition, the failure of our telecommunications providers to supply the necessary services could also interrupt our business. The inability to supply services to our customers could negatively affect our business, may lead to lawsuits or loss of customers and may also harm our reputation.

Prospectus at 12 (original emphasis). Concerning possible customer losses, the Prospectus states as follows:

---

**3.** Citations in the format "¶ ___" refer to the Complaint.

**Because our customers are subject to industry consolidation, economic downturn and other factors, and because of [a merger], we may lose customers with little notice.**

Customer attrition is a normal part of the electronic transaction processing business. This attrition occurs among our customer base due to consolidation in the community banking industry, small business failures and other reasons. We have experienced and will experience losses of customers due to attrition.

Prospectus at 10 (original emphasis).

On August 9, 1999, a press release from Towne reported results for the second quarter of 1999—results which, Towne emphasized, had exceeded analysts' revenue and earnings estimates. The earnings and revenue results included a sale of software for $750,000.[4] Without the software sale revenues. Towne would not have been able to report record results for the second quarter. The complaint alleges that the software sale was not revealed to the public at the time the second quarter results were announced and that the software sale was "an extraordinary, nonrecurring transaction that was outside the regular course of Towne's business." ¶ 5. *See also* ¶ 49 ("completely outside the regular course of Towne's business"). Towne's earnings report did not indicate that it included revenue ˙from a transaction outside the ordinary course of its business.

Provident Investment Council, Inc. ("Provident"), an Institutional investor, had purchased 660,000 shares of Towne in connection with the SPO, Provident sold its entire stake in Towne on August 13, 1999 (4 days after the earnings report was released). After (and allegedly as a result of) Provident's sale, the price of Towne's stock fell from $7.125 to $5.5625. The complaint alleges that Provident made the decision to sell its Towne holdings after learning about the customer losses and the software sale in a telephone conversation that took place within days of the decision to sell.

On August 19, 1999, Towne announced the resignation of Defendant Edwards as the company's CEO. The complaint alleges that at a meeting with investment analysts on September 2, 1999, Towne represented that it was "on track" to meet third quarter revenue and earnings estimates. On September 3, 1999, investment analysts released a report stating the following:

> On September 2, 1999, we met with management of [Towne] at its corporate headquarters. From our meeting, we believe that [Towne] is on track to hit our estimates of $9.3 million in revenue, a loss of $0.01 and breakeven on a cash flow basis in Q3'99.

¶ 71. On October 13, 1999, Towne announced that third quarter results were expected to be well below estimates, resulting in a loss of between $0.08 and $0.12 a share. Following this disclosure, the price of Towne's stock fell to $2.75 per share.

### C. Claims under Section 10 of the Securities Exchange Act of 1934

#### 1. General Principles

Section 10 of the Exchange Act makes it "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC]

---

**4.** Some materials indicate that the sale was for $750,000. A later representation by Towne states that the sale was only for $600,000. For the purpose of this motion, however, the court must assume that the sale was for $750,000.

may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C.A. § 78j(b). Pursuant to this authority, the SEC has promulgated its well-known Rule 10b–5, which states as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

An implied private cause of action to enforce Rule 10b–5 has long been recognized. *See, e.g., Basic, Inc. v. Levinson,* 485 U.S. 224, 230–31, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Judicial interpretation and application, legislative acquiescence, and the passage of time have removed any doubt that a private cause of action exists for a violation of § 10(b) and Rule 10b–5, and constitutes an essential tool for enforcement of the [Exchange] Act's requirements."). The complaint alleges violation of all three subsections of Rule 10b–5, although no meaningful differentiation is made among them. Only subsections (a) and (c) make explicit reference

to "defrauding" or "fraud," but it appears that Rule 10b–5 has often been treated as a unitary action for fraud requiring proof of "1) a misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury." *Bryant,* 187 F.3d at 1281.

### 2. *Heightened Pleading Standards*

Federal Rule of Civil Procedure 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," and this rule applies to claims under Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. *See, e.g., In re Theragenics,* 105 F.Supp.2d at 1348–49. Rule 9(b) ordinarily requires the "who, what, when, where, and how: the first paragraph of any newspaper story." *Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1470 (N.D.Ga.1997) (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990)).

The Private Securities Litigation Reform Act of 1995 ("Reform Act"), Pub.L. No. 104–67, imposes additional heightened pleading standards. The first is that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C.A. § 78u–4(b)(1).[5] This portion of the Reform Act seems to duplicate or at least overlap with Rule 9(b).

The second heightened requirement is that "the complaint shall, with respect to each act or omission alleged to violate [the Exchange Act], state with particularity facts giving rise to a strong inference that

---

**5.** This requirement applies to "any private action arising under the [Exchange Act] in which the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact

necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." 15 U.S.C.A. § 78u–4(b)(1).

the defendant acted with the required state of mind." 15 U.S.C.A. § 78u–4(b)(2).[6] This requirement is more rigorous than Rule 9(b), which provides that "malice, intent, knowledge, and other condition of mind of a person may be averred generally."

■ The final requirement is that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C.A. § 78u–4(b)(1). A threshold question with respect to this requirement is what constitutes a statement made "on information and belief." The plaintiffs argue that all of the complaint's allegations are, at a minimum, based on the investigation of counsel. This court, however, agrees with another opinion from this district rejecting the distinction between allegations based on "information and belief" and those made based on the investigation of counsel:

> The Court ... agrees with those [cases] that hold that allegations based on the investigation of counsel are the equivalent of allegations based on information and belief. For this Court to rule otherwise would elevate form over substance and allow plaintiffs to avoid the Reform Act's mandate merely by cloaking with a license to practice law the information and belief on which a complaint is based. Rule 11 of the Federal Rules of Civil Procedure provides that, by presenting a pleading, motion, or other paper to a court, an attorney is certifying that he has conducted "an inquiry reasonable under the circumstances." Fed.R.Civ.P. 11(b). Prior to the Reform Act, Rule 11 required that an attorney in every case

must investigate claims before filing a complaint. Congress, rightly or wrongly, decided that the protection of Rule 11 against frivolous lawsuits was not enough. The Court must conclude that a bare recitation that the Complaint is based upon the investigation of counsel does not satisfy the pleading requirements of the Reform Act.

*In re Theragenics,* 105 F.Supp.2d at 1351. To the extent the plaintiffs do make allegations "on information and belief" (so understood), they must "state with particularity all facts on which that belief is formed." 15 U.S.C.A. § 78u–4(b)(1).

■ The parties also differ as to the scope of this burden. The *Theragenics* decision relied on and adopted the Second Circuit's framework for resolving this issue, which this court will employ as well:

> In our [the Second Circuit's] view, notwithstanding the use of the word "all," [the Reform Act] does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs. Accordingly, where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the informa-

---

**6.** This requirement applies to "any private action arising under the [Exchange Act] in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind." 15 U.S.C.A.

§ 78u–4(b)(2). As noted above, a Rule 10b–5 action does have a scienter or state of mind requirement, and the heightened pleading standard therefore applies.

tion alleged. In both of these situations, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out.

*Theragenics,* 105 F.Supp.2d at 1355 (quoting *Novak v. Kasaks,* 216 F.3d 300, 313 (2d Cir.2000), *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000)*).*

The language quoted above focuses on personal sources for allegations made on information and belief, but the requirement may be satisfied by other types of sources, e.g., newspaper articles, internal documents, etc.[7] This last hurdle seems to the court to be closely akin to a very light burden of production. That is, in an action governed by the Reform Act's heightened standards, a claimant may not simply make an allegation on "information and belief," but rather, must come forward with some source or basis for the allegation. The claimant is not required to present the evidence (as it would if this were truly a burden of production) but the source must be identified with enough particularity to enable the court to determine whether it provides an appropriate basis for any allegation made "on information and belief."

### 3. *Summary of the Court's Mode of Inquiry*

After this lengthy (but, in this court's view, unavoidable) preface, it seems useful to summarize the nature of the court's inquiry, particularly insofar as it differs from routine analysis of a 12(b)(6) motion. When considering such a motion, the court ordinarily accepts all the allegations of the complaint as true and simply considers them in light of the applicable law to determine if the plaintiff has a cause of action. Rule 9(b) and the Reform Act re-

quire the court to go beyond the complaint, or at least to question it, in the following three ways:

- First, the court must determine if the complaint's allegations are sufficiently particularized. The plaintiffs must provide the "who, what, when, where and how" of the alleged fraud. They must also "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference" that the defendants acted with scienter. 15 U.S.C.A. § 78u4(b)(1), (2).

- Second, once the allegedly misleading statements have been identified, the court may rely on documents appropriately subject to judicial notice to evaluate what statements were actually made (as opposed to conclusory characterizations of such statements in the plaintiffs' complaint). The court may also rely on other statements within judicially-noticed documents to determine whether the allegedly misleading statements are actionable. For example, cautionary language may entitle a defendant to the benefit of the statutory safe harbor for "forwardlooking" statements or the comparable, judicially-created "bespeaks caution" doctrine. Also, the total mix of information available to investors may make the allegedly misleading statements immaterial as a matter of law.

- Third, the court has some obligation to test allegations made "on information and belief" to ensure that they have some basis (beyond the good faith required by Rule 11). As noted above, the court views this require-

---

**7.** *See In re Theragenics Corp. Sec. Litig.,* 137 F.Supp.2d 1339, 1345 (N.D.Ga.2001) ("In practice, this pleading requirement may be satisfied by references to internal memoranda or other documents, press releases, news articles and government-mandated filings.").

ment as something very close to a burden of production. The plaintiff need not actually present evidence to support allegations made on information and belief, but some basis for such allegations must be identified in the complaint, such as an informant or a document.

Although these steps are somewhat more rigorous than routine analysis of a 12(b)(6) motion, the defendants' motions cannot be treated as a request for summary judgment. The Reform Act and Rule 9(b) embody important policies for curbing abusive litigation, but they cannot be applied in a manner that eviscerates the substantive goals of securities law. The overall effect of the heightened pleading standards is simply that the plaintiffs must provide greater detail and have less latitude to make allegations on information and belief. These standards do not alter or eliminate the fundamental premise articulated in *Conley*: the court must accept as true all properly-pleaded allegations, and dismissal is appropriate only if the plaintiffs can prove "no set of facts" that would entitle them to relief. With these preliminary observations in mind, the court considers each element of the plaintiffs' Rule 10b–5 claim.

### 4. *Elements*

The plaintiffs' fraud claims are principally based on the following three alleged omissions: (1) failure to disclose in the Prospectus the occurrence of disruptions in Towne's data lines (caused by Towne's relocation of its headquarters) and the resultant loss of customers and revenues; (2) failure to disclose the software sale as an extraordinary, non-recurring revenue source in an August 9 press release concerning second quarter earnings and Towne's 10–Q for the second quarter of 1999; and (3) failure to disclose to analysts at a meeting on September 2, 1999, that sales were declining.

The court notes that these theories (with the possible exception of the third) rely on an alleged failure to disclose material information. While the Exchange Act may promote a policy in favor of disclosure, "when an allegation of fraud is based on nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). With respect to Rule 10b–5, the duty to disclose (if any) arises from subsection (b), which requires disclosure of information "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Thus, the question is not simply whether the defendants omitted information potentially of interest to investors. To be actionable, the omission must render the statements *actually made* misleading.

### a. *misstatement or omission*

#### i. *failure to disclose June 1999 disruptions*

■ The complaint alleges that statements in the Prospectus about Towne's computer systems are false and misleading because (1) they failed to disclose already-existing problems and resulting customer losses, and (2) simultaneously made assurances about the reliability of Towne's systems and provided only vague warnings about the threat posed by a system failure and/or customer attrition. Before exploring the parties arguments, the court notes the somewhat attenuated relationship between this allegedly actionable omission and the statements *actually made.* Towne never stated that "we have no current problems with our computer systems," or anything like that. The plaintiffs' position is that the Prospectus's open-ended, general, and future-oriented warnings about Towne's computer systems (and the possibility of customer attrition) are misleading in light of severe, discrete problems Towne had already suffered in this regard. This

theory is plausible. The court determines below that the plaintiffs have properly pleaded sufficiently severe problems existing at the time of the SPO, and that these allegations are the answer to most of the defendants' arguments. The court notes and emphasizes, however, that having survived a motion to dismiss by alleging a "severe" disruption in early June and "massive" customer losses as a result, the plaintiffs will be required to sustain these allegations with the quantum of proof appropriate at successive stages of this litigation.

The defendants raise the procedural argument that all the ominous adjectives (severe, pervasive, massive, etc.) used in the Complaint are made on information and belief and lack an adequate basis. The *Wall Street Journal* article, however, states that the customer losses were "higher-than-usual" in the second quarter, and plainly links them to a temporary shut down in Towne's data lines caused by the relocation on or around June 7th. Of course there is a difference between these statements and the rhetorical embellishments in the Complaint, but the court concludes that this is not the type of discrepancy that warrants dismissal on a 12(b)(6) motion. The plaintiffs may not be able to quantify the extent of the customer loss before the SPO, or the length of time that Towne's systems were shut down—but even under the heightened standards of Rule 9(b) and the Reform Act these are the sorts of details that could only be obtained after a reasonable opportunity for discovery. The plaintiffs have stated facts

and identified sources adequate to support their allegations that (1) a technical problem occurred in connection with the relocation of Towne's headquarters, (2) customer losses occurred as a result, and (3) these problems were severe enough that Towne's failure to disclose them in the Prospectus is a potentially actionable "misstatement or omission." [8]

The defendants also argue that the allegedly misleading portions of the Prospectus are protected under the statutory safe harbor for "forward-looking" statements, *see* 15 U.S.C.A. § 78u–5, or the judicially-created "bespeaks caution" doctrine. *See Saltzberg v. TM Sterling/Austin Assocs., Ltd.*, 45 F.3d 399, 399 (11th Cir.1995) (adopting the "bespeaks caution" doctrine as articulated in *Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3rd Cir.1993)). Both recognize that a business's predictions or expectations, if couched in or accompanied by appropriate cautionary language or disclaimers, should not give rise to a cause of action merely because later events do not bear them out. *See Saltzberg*, 45 F.3d at 399 ("When an offering document's projections are accompanied by meaningful cautionary statements and specific warnings of the risks involved, that language may be sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law."). An otherwise actionable omission concerning past or present problems, however, cannot be sanitized by forward-looking statements about similar problems.[9] The plaintiffs do not contend that the statements in the prospectus are false or

---

**8.** The Complaint also lists, at length, a variety of business problems Towne (allegedly) was experiencing, such as "bugs" or other difficulties with its computer networks, software, and telecommunications systems, and poorly trained technical or customer support personnel. *See, e.g.*, ¶¶ 38–45. The Complaint further alleges that as a result of the problems and/ or shortcomings of one of its products,

Towne emphasized sales of another. *See* ¶¶ 41–43. These allegations may provide some useful background information, but Towne's failure to disclose "bugs" and the like does not, in and of itself, state a claim under Rule 10b–5.

**9.** *See, e.g., In re Premiere Techs.*, 2000 WL 33231639, at *17, 2000 U.S. Dist. LEXIS

misleading because of later events, but rather, that they are false or misleading because of events that had already occurred at the time of the SPO. A claim of this type is not barred by the safe harbor for "forward-looking" statements or the "bespeaks caution" doctrine.[10]

The defendants next raise a series of arguments about the timing of the alleged customer losses, and the effect that timing has on any obligation to disclose. The first argument in this vein seems to be purely procedural, namely, that the Complaint does not allege with sufficient particularity that customer losses occurred *before* the prospectus became effective. But the complaint does state that Towne had experienced technical problems because of the relocation and suffered customer losses that were affecting Towne's business at the time of the SPO. *See* ¶ 52. The plaintiffs also have alleged that greater-than-ordinary customer losses occurred in the second quarter. The Prospectus became effective only seven days before the end of the second quarter, and it would be improper on a Rule 12(b)(6) motion for the court to assume that all of the second

quarter customer losses occurred in the last seven days of the quarter. To the extent this allegation is made on information and belief, it is adequately supported by the *Wall Street Journal* article. In short, the complaint itself, the facts it states, and the sources it identifies, adequately support the plaintiff's theory that the early June disruption and resultant customer losses had occurred (or, at least, begun to be felt) before the SPO.

The defendants' more substantive argument about timing is that the statements in the Prospectus could not have been false or misleading "when made" because even if customer losses did occur as a result of the data line disruption, any ultimate injury resulting therefrom would not have been "realized" or "known" until after the SPO became effective. Towne stresses here the short period of time between the relocation (June 7) and the effective date of the SPO (June 23), and the fact that the second quarter was not yet over at the time of the SPO.

In support, Towne relies on cases articulating the principle that there is no "fraud by hindsight." [11] In short, the argument is

19207, *56 (N.D.Ga. Dec. 8, 2000) ("Statements and omissions of past and current circumstances cannot be cured by reference to future difficulties and undetected problems."); *In re ValuJet, Inc. Sec. Litig.,* 984 F.Supp. 1472, 1479 (N.D.Ga.1997) ("Plaintiffs do not allege that Defendants fraudulently announced expansion plans and then failed to follow through on these plans. Instead. Plaintiffs allege misrepresentation of existing facts."); *Gross,* 977 F.Supp. at 1473 ("[T]he statutory safe harbor, like the 'bespeaks caution' doctrine, does not insulate defendants from private securities liability based on statements that misrepresent historical/hard or current facts.").

**10.** The cases cited by the defendants in an effort to refute this argument are inapposite. None deals with a situation in which a defendant makes vague warnings about a potential problem in the future, when a highly similar if not identical problem had *already* and re-

*cently* occurred. As relevant here, the Eleventh Circuit's decision in *Harris* dealt with a list of factors predicted to affect the defendant's business, the list omitted an event that occurred *after* the list was disseminated. *See* 182 F.3d at 802, 805–08. Thus, *Harris* dealt with the typical "forward-looking" scenario, i.e., predictions that do not come true. Similarly, in *Gasner v. Board of Supervisors,* 103 F.3d 351, 359 (4th Cir.1996), the representations at issue warned of risks that *later* materialized. *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407 (9th Cir.1994) did deal with a problem existing at the time the representations in question were made, but the defendant's representations included some acknowledgment of an *existing* problem, not simply vague warnings that a similar problem could occur in the future. *Id.* at 1416–17.

**11.** *See generally DiLeo,* 901 F.2d at 627–28 ("The story in this complaint is familiar in

that between June 7th and the beginning of the SPO on June 23rd, it would be impossible for the alleged problem to have become severe enough to give rise to an obligation to make a disclosure.[12] Granting the defendants' motion to dismiss on this ground would require the court to resolve factual issues in the defendants' favor in a manner improper on a motion to dismiss. As noted above, the plaintiffs have properly pleaded that a disruption occurred on June 7, and greater-than-usual cancellations resulted. The defendants' argument that any long-term damage to Towne's business would not have been felt so quickly (for example, because of waiting periods for cancellations to take effect or delays in billing) involves the type of inferences that this court cannot draw on a motion for summary judgment. The presence of a properly-plead allegation of an existing problem at the time the statements and omissions were made renders the no-hindsight cases inapplicable.[13] The former Fifth Circuit summed up this principle nicely when it stated "to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Huddleston v. Herman & MacLean,* 640 F.2d 534, 544 (5th Cir.1981), *aff'd. in relevant part and rev'd in part,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

The defendants also rely on cases in which courts have been reluctant to impose an obligation to disclose losses that occurred in a pending quarter. *See, e.g., Zucker,* 891 F.Supp. at 1015–16 (omission of increased rate of merchandise returns in pending quarter found non-actionable). This court cannot endorse, however, a *per se* rejection of a duty to disclose events that occurred in a particular quarter (and the defendant has not provided authority in support of such an inflexible rule). Fiscal quarters of course are regularly relied upon in the financial world. It is true, almost by definition, that no one could be

securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. . . . [T]he complaint . . . discloses none of the circumstances that might separate fraud from the benefit of hindsight. There is no 'fraud by hindsight', in Judge Friendly's felicitous phrase.") (quoting *Denny v. Barber,* 576 F.2d 465, 470 (2nd Cir. 1978)).

**12.** The defendants' argument here is, in essence, that there was nothing that Towne *could have known* at the time the Prospectus issued that it would have been obligated to disclose. Although this bears some resemblance to the scienter element insofar as it concerns knowledge, scienter focuses on whether the defendants in fact *did know* that their statements were false. Scienter is discussed below.

**13.** *See, e.g., In re Splash Technology Holdings, Inc.,* 2000 WL 1727377, at *13, 2000 U.S. Dist. LEXIS 15370, at *17 (N.D.Cal. Sept. 29, 2000) ("For example, the complaint can allege specific contemporaneous problems undermining a defendant's optimistic claims."). In other cases relied upon by the defendants, courts could not determine, on the well-pleaded facts before them, that specific contemporaneous problems existed which were at odds with representations actually made. *See Zucker v. Quasha,* 891 F.Supp. 1010, 1016 (D.N.J.1995) (court "was at a loss to identify what information relating to return rates existed during the first quarter of 1994 that was omitted from the Prospectus and Registration Statement.") (emphasis added), *aff'd without op.,* 82 F.3d 408 (3rd Cir.1996); *see also Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037 (6th Cir.1991) ("the plaintiffs did not offer any objective evidence that the statements were anything other than honestly held convictions based on the historical information which [the defendant] possessed."). These cases articulate relevant principles, but they do not help the court evaluate the properly-pleaded facts of this case, where the plaintiffs have demonstrated a specific contemporaneous problem.

liable for a misstatement or omission concerning the final results of business activity in a particular quarter until that quarter had ended. Even if the court accepts the proposition that incomplete quarter results do not generally have to be disclosed, the plaintiffs' complaint in this case alleges a discrete damaging event—the disruption of Towne's data lines—coupled with higher-than-ordinary customer cancellations. The court cannot conclude, at this stage of the proceedings, that there was no obligation to disclose these facts in the Prospectus.

### ii. *Second Quarter Results (Software Sale)*

■ The plaintiffs allege that Towne failed to disclose that the software sale was a portion of their second quarter earnings, and that this sale was an extraordinary event, required to be disclosed in accordance with generally-accepted accounting principles. As relevant to the first element (misstatement or omission). Towne argues that the sale was disclosed, and that the plaintiffs have not adequately supported their allegation that the sale was an "extraordinary" event.

The defendants argue that the software sale was announced in a "research note" released within days of the earnings press release. The court finds, however, that the alleged research note may not properly be the subject of judicial notice. The research note has not itself been made of record. Although it is referred to briefly in the *Wall Street Journal* article, there is no way for the court to determine exactly what the content of the note was. As explained above, the court has taken judicial notice of certain documents only to determine what statements were actually made, and the *WSJ* article does not enable the court to assess the content of the research noted. Moreover, this point appears to be disputed—the plaintiffs maintain that the sale was not publicly disclosed.[14]

Towne also argues that the release itself and its second quarter 10–Q revealed the distinction between its "recurring" and "non-recurring" revenue. The court agrees with the plaintiff, however, that "non-recurring" is not the same as "extraordinary." For example, Towne's "non-recurring" revenue might include service initiation fees that nevertheless are within the ordinary course of Towne's business. If the software sale was not only "non-recurring," but also "extraordinary," then Towne's failure to disclose it is a potentially actionable omission.

And finally, the defendants argue that the allegation that the sale was "extraordinary" is made on information and belief and is not adequately supported. They point to a statement in the *WSJ* article that Towne engaged in software sales once a quarter. To credit this statement, however, the court would have to rely on the *WSJ* article for the truth of the matter asserted. Moreover, the point is disputed, and the plaintiffs have adequately stated facts and identified sources in support of their allegation that the software sale was extraordinary. Even if Towne's comment is credited, it still supports the notion that software sales are not part of Towne's day-to-day business. Moreover, the plaintiffs have also properly pleaded Provident's reaction to news of the software sale (arid its omission from Towne's representations concerning second quarter earnings). These facts provide adequate support for the plaintiffs' allegation that the sale was "extraordinary."

---

**14.** The court emphasizes that its rejection of the defendants' argument is procedural; the content of this research note may have a substantial impact on the viability of this claim.

### iii. *September 2nd meeting with analysts*

■ As noted above, Towne representatives met with analysts on September 2nd. On September 3rd, some analysts released statements expressing their "belief," based on the meeting, that Towne was "on track" to fulfill estimates for its third quarter earnings. Towne ultimately fell far short of those estimates. Towne argues that the analysts' beliefs or expectations are non-actionable opinions (as opposed to statements of fact), and that, in any case, the analysts' statements may not be attributed to Towne.

The plaintiffs attempt to evade these arguments by asserting that their claim is not based on the statement itself, but rather, on misrepresentations made to the analysts at the meeting. But if this is so, then the plaintiffs must provide particularized allegations of the misrepresentations made at the meeting, and must identify adequate support for any allegations made on information and belief. The plaintiffs have not done so. They may have provided the "when". (September 2nd) and the "where" (at the meeting), but they have not provided the "who," "what," or "how," and they have failed to identify specific statements alleged to be misleading. Their argument is that if analysts released a positive statement after the meeting, then Towne must have lied. While this may not be utterly implausible, under applicable pleadings standards, it is neither sufficiently particularized (as to what exactly was said), nor does it provide an appropriate basis for the plaintiffs "information and belief" allegation that misrepresentations were made. Accordingly, any claims based on the alleged misrepresentations at the September 2nd meeting are dismissed.

### b. *materiality*

■ "[A]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it im-

portant," *Basic*, 485 U.S. at 231, 108 S.Ct. 978 (quoting *TSC Indus., Inc. v. Northway*, 426 U.S. 438, 449 n. 7, 96 S.Ct. 2126, 2130 n. 7, 48 L.Ed.2d 757 n. 7 (1976)*)*. To be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." 485 U.S. at 231–32, 108 S.Ct. 978 (quoting *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126). At the 12(b)(6) stage, a complaint may be dismissed on materiality grounds only when "the alleged misstatements and omissions are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *In re Theragenics*, 105 F.Supp.2d at 1359 (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2nd Cir.1985)*)*.

Towne repeats here its arguments that the Prospectus adequately advised investors of potential risks from technical problems and that the software sale had been adequately disclosed. These arguments were addressed above, and the court cannot conclude that reasonable disagreement about the importance of these facts is impossible. Towne also repeats here its argument that there is no obligation to disclose negative trends before the end of a quarter. The plaintiffs have alleged a specific discrete problem (the June 7 disruption) causing, or, at least, materially exacerbating customer attrition. Thus, this case is different from those in which there is merely a failure to disclose a downward trend. *Cf. Klein v. Maverick Tube Corp.*, 790 F.Supp. 68, 70 (S.D.N.Y.1991) (failure to report reduced earnings), *aff'd without op.*, 969 F.2d 1041 (2nd Cir.1992).

The defendant also makes the conclusory assertion that omitted information was not of sufficient magnitude to require disclosure. This obviously is a fact-sensitive

issue. Beyond their support for the general proposition that some information may be too unimportant, the cases cited by the defendants do not assist the court in analyzing the facts of this case. *See, e.g., Greebel v. FTP Software, Inc.,* 194 F.3d 185, 206 (1st Cir.1999) (not material that $1.55 million out of $37.1 million of reported revenue may have been improperly realized); *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 547 (8th Cir.1997); (overstatement amounting to approximately 2% of total assets was not material); *Backman,* 910 F.2d at 11–12 (concluding after discovery and jury trial that omission of cancelled contract was immaterial as a matter of law). It appears that software sales may have accounted for as much as 10% of Towne's revenues for the second quarter, and judging from Provident's (alleged) reaction to this knowledge, the court cannot conclude that it was immaterial. As for the Prospectus, the court does not know the extent or length of the shut-down and/or the number of customer cancellations. The plaintiffs have alleged that it was significant (and provided adequate support for this allegation); beyond this, the plaintiffs should be permitted to conduct discovery concerning this issue.

### c. *scienter*

As noted above, the Reform Act requires the plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. § 78u–4 (b)(2). The Eleventh Circuit has held that pleading motive and opportunity does not fulfill this requirement, and that a claimant's allegations must show "severe recklessness." *Bryant,* 187 F.3d at 1283–87. "Severe recklessness" has been defined as follows:

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers and sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 1282 n. 18. Difficult scienter issues can arise when information not necessarily within the control of a defendant forms the basis of a fraud claim.[15] In this case, however, the plaintiffs (remaining) claims focus on (1) a shut-down of Towne's data lines and a greater-than-usual cancellation of its customer contracts, and (2) bookkeeping issues that, in light of Provident's alleged reaction, can fairly be characterized as sensitive. The plaintiffs have properly pleaded that a "serious" disruption occurred, "massive" customer cancellations contemporaneously occurred, and an "extraordinary" asset sale was omitted from earnings reports. No further facts need be pleaded to support a strong inference that Towne was at least "severely reckless" if it remained unaware of these facts.

### d. *reliance*

"[R]eliance is an element of a Rule 10b–5 cause of action. Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury," *Basic,* 485 U.S. at 243,

---

**15.** For example, in the *Theragenics* case, the court initially found that scienter was inadequately pled because "Plaintiffs have provided no reference to show that Defendants knew that [a competitor's] shortage was temporary and that [the defendant's] revenues consequently would decrease once [the competitor] remedied the shortage." 105 F.Supp.2d at

1360. (The court later found that the defendant's monitoring of its competitor had been adequately pled to support a finding of scienter, *see* 137 F.Supp.2d at 1347–49). But this case does not seem to deal with information outside of Towne's possession, custody and control.

108 S.Ct. 978. The Supreme Court has approved use of the fraud-on-the-market theory as a basis for a rebuttable presumption of reliance in Rule 10b–5 cases. *See Basic,* 485 U.S. at 242–49, 108 S.Ct. 978. The gist of the theory is that the market price of a publicly-traded security is determined by the information available about a company, and so, misleading statements or omissions about a company effectively defraud any person who purchases the security at the (inaccurate) market price. Under this sub-heading, the defendants argue that there is no duty to disclose negative trends (such as losses in second and third quarter 1999) until the end of the quarter. The duty to disclose issue is addressed above in connection with the "misstatement or omission" element.[16] The prerequisites of the fraud-on-the-market theory have been pleaded and are not challenged by the defendants.

### e. *causation*

 To sustain their claim, the plaintiffs must show some relationship between the subject of omissions or misrepresentations and the reason the stock fell in value. The Eleventh Circuit has described the causation element as follows:

> To prove loss causation, a plaintiff must show that the untruth was in some reasonably direct, or proximate, way responsible for his loss. If the investment decision is induced by misstatements or omissions that are material and that were relied upon by the claimant, but are not the proximate reason for his pecuniary loss, recovery under [Rule 10b–5] is not permitted. In other words loss causation describes the link between the defendant's misconduct and the plaintiff's economic loss.
>
> Because market responses, such as stock downturns, are often the result of many different, complex, and often unknowable factors, the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was substantial, i.e., a significant contributing cause. **In other words, plaintiff must show that misrepresentation *touches upon* the reasons for the investment's decline in value.** This intermediate approach balances our twin concerns of compensating investors who have suffered loss as a result of a fraudulent misrepresentation, while at the same time preventing 10b–5 from becoming a system of investor insurance that reimburses investors for any decline in the value of their investments.

*Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997) (citations and quotations omitted; emphasis added). The defendants' argument in this regard is that the complaint alleges that the decline in the value of Towne's stock was caused by Provident's rapid sell-off, not by the alleged misrepresentations and omissions. But the complaint also alleges (with support) that this sell-off occurred, at least in part, because of the misrepresentations and omissions at issue in this case. The court concludes that the plaintiffs have

---

16. Towne cites the First Circuit's decision in *Backman v. Polaroid Corp.,* 910 F.2d 10 (1st Cir.1990) (en banc). This case emphasizes that the "fraud-on-the-market" theory is only a rebuttable presumption concerning the reliance element of a Rule 10b–5 action. *Id.* at 13. The theory does not obligate publicly-traded companies to disclose all material information relevant to an accurate determination of their market value. For omissions to be actionable, they must be necessary to render statements actually made not misleading (or otherwise be subject to a duty to disclose). But where, as here, a plaintiff has otherwise shown actionable omissions, the fraud-on-the-market theory is available to fulfill the reliance requirement.

adequately fulfilled the "touches upon" standard.

### 5. *Miscellaneous Allegations*

The court's discussion thus far has focused on the Prospectus, the press release and 10–Q filing concerning second quarter earnings, and the September 2nd meeting with investment analysts. The complaint makes reference to a number of other representations. The defendants' moving papers are organized around the three general areas listed above, and the plaintiffs have not made specific arguments as to why or how any of the remaining representations are separately actionable. In the interests of clarity, the court will briefly discuss the other representations identified in the complaint.

Paragraph 54 of the complaint alleges that on July 1, 1999, Towne issued a press release announcing its acquisition of Forseon Corporation, stating as follows: "[t]he addition of Forseon's products and services to Towne's portfolio further sets us apart from our competition. By combining Forseon's forecast and planning services and point-of-sale products with Towne's e-commerce and accounts receivable processing solutions, we are able to report a broader range of products to both our current and potential clients." The complaint does not make sufficiently particularized allegations as to how or why this representation is or could be actionable under Rule 10b–5. The absence of such allegations makes it impossible for the court to evaluate this representation more fully, but the court notes its doubt that vaguely optimistic statements such as "sets us apart from our competition," and "report a broader range of products" could be actionable.

Paragraph 55 of the complaint alleges that at a July 1999 conference hosted by investment analysts representatives of Towne stated "that business trends at Towne were 'strong' and that Towne was 'comfortable' with analysts' second quarter revenue estimates of $7.9 million." This representation may be relevant in connection with the August 9, 1999 press release concerning second quarter estimates and the second quarter 10–Q but the plaintiffs have not adequately pleaded a separate claim based on this representation.

Paragraph 65 quotes an *Atlanta Journal–Constitution* article in which Defendant Lowthers represented that Provident sold its shares because it expected Towne to surpass second quarter earnings estimates by a wider margin than it had. This representation may also be relevant to the claim concerning description of second quarter earnings, but it has not been shown to be independently actionable.

### D. *Claims under Section 11 of the Securities Act of 1933*

Section 11 of the Securities Act provides a cause of action to injured investors if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C.A. § 77k(a). This cause of action is limited to the content of the Prospectus. The defendants argument here is that any statements in the Prospectus were either not material or were protected by the safe harbor for "forward-looking" statements and/or the bespeaks caution doctrine. The court has rejected these arguments above.

The parties dispute somewhat whether heightened pleadings standards apply to the Securities Act claim. Because the court finds that the plaintiffs have adequately pled an Exchange Act claim with respect to the Prospectus, it is unnecessary for the court to resolve this issue.

## E. *Individual Liability*

 In addition to the corporate defendant, the plaintiffs also seek to impose individual liability on Edwards, Baroco, and Lowthers. All three of these individuals are alleged to have participated in the preparation of the Prospectus and to have signed it, and therefore may be held directly liable under Section 11 of the Securities Act for actionable statements or omissions therein. *See* 15 U.S.C.A. § 77k(a)(1). The plaintiffs also seek to hold the individual defendants liable as primary violators of Rule 10b–5, and under the Exchange Act's provision for "control" person liability, which states as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation there-under shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C.A. § 78t(a).[17] The term "control" is defined by regulation to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. "In this circuit, a defendant is liable as a controlling person under section 20(a) if he or she had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws and had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir.1996).

None of the individual defendants denies that he had the "power to control the general affairs" of Towne. The crucial question is whether each had "control" or "influence" over the specific corporate policy forming the basis for the defendants' claims. The court finds that control over the specific corporate policies in question has been adequately pleaded based, *inter alia*, on the following: (1) the individual defendants were Towne's highest ranking officers; (2) they all signed the Prospectus; (3) they attended a conference in July 1999 at which comments were made on Towne's second quarter earnings; (4) Defendant Edwards spoke with Provident concerning Towne's second quarter earnings report; and (5) Defendant Lowthers made public comments about the alleged reasons for Provident's sale of its Towne holdings. At this stage of the proceedings, these allegations suffice to show that the individual defendants were sufficiently involved with the particular activities of Towne leading to the allegedly actionable omissions.

The court has determined that this action may proceed against the individuals as primary violators of the Securities Act and as control persons responsible for Exchange Act violations. It therefore is unnecessary for the court to address the remaining issues raised concerning any claim that the individual defendants may be held liable as primary violators of the Exchange Act, specifically, whether company statements may be attributed to the individual defendants via the "group pleading" doctrine and whether scienter is ade-

---

17. Section 15 of the Securities Act, 15 U.S.C.A. § 77o, also provides a comparable "control" person liability provision, but, as noted above, all the individual defendants may be held primarily liable as signatories of the prospectus, and it therefore is unnecessary to address the Securities Act's "control" provision.

quately pleaded as to the individual defendants.

### III. Summary

The defendants' motions to dismiss [Doc. Nos. 32–35] are GRANTED IN PART and DENIED IN PART. Specifically, all claims relating to the allegedly false statements made to investment analysts in September 1999 are DISMISSED as to all defendants. All other claims (as understood and limited by this opinion) will be allowed to proceed. As the plaintiffs have not previously had the court's guidance concerning these issues, they are allowed ten (10) days to file an amended complaint.