## In re BELLSOUTH CORPORATION SECURITIES LITIGATION.

### No. 1:02–CV–2142–WSD.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 8, 2005.

Martin D. Chitwood, Nichole Tara Browning, Chitwood & Harley, Atlanta, GA, Steven G. Schulman, PHV, Samuel H. Rudman, PHV, Milberg Weiss Bershad Hynes & Lerach, Francis P. Karam, PHV, Andrea H. Williams, PHV, Randall K. Pulliam, PHV, S. Gene Cauley, PHV, Bernstein Liebhard & Lifshitz, Jack G. Fruchter, PHV, Abraham Rappaport, PHV, Kenneth J. Vianale, PHV, Fruchter & Twersky, New York, NY, Maya Saxena, PHV, R. Timothy Vannatta, PHV, Milberg Weiss Bershad Hynes & Lerach, Boca Raton, FL, for Plaintiff.

Peter Quirk Bassett, John Ludlow Latham, Teresa Thebaut Bonder, John H. Goselin, II, Alston & Bird, Atlanta, GA, Andrew J. Morris, PHV, Mayer Brown Rowe & Maw, Washington, DC, Alan N. Salpeter, PHV, Michele L. Odorizzi, PHV, Mayer Brown Rowe & Maw, Chicago, IL, for Defendant.

## *ORDER*

DUFFEY, District Judge.

This matter is before the Court on Defendants' Motion to Dismiss the Consolidated and Amended Class Action Complaint [75], Defendants' Amended Memorandum in Support of their Motion to Dismiss the Consolidated and Amended Class Action Complaint [92], Plaintiffs' Response to Defendants' Motion to Dismiss [86], and Defendants' Reply Memorandum in Support of their Motion

to Dismiss the Consolidated and Amended Class Action Complaint [93].[1]

## I. FACTUAL BACKGROUND

This is a federal securities class action brought against BellSouth Corporation ("BellSouth") and specific officers and directors of BellSouth. Plaintiffs allege claims under the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j, and the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k-l. Essentially, Plaintiffs contend the company and individual defendants knew about or recklessly disregarded practices that the company engaged in during the Class Period, causing the company's revenue to be overstated and the company's stock to be artificially inflated. The first of a series of similar securities fraud complaints was filed against BellSouth on August 1, 2002. On July 17, 2003, the suits filed against the company were consolidated under the Consolidated and Amended Class Action Complaint for Violation of Federal Securities Laws filed by the Plaintiffs [68].

### A. Parties

#### 1. Plaintiffs

The Exchange Act claims are brought on behalf of a class of Plaintiffs who purchased BellSouth common stock between November 7, 2000, and February 19, 2003 (the "Class Period"). The Securities Act claims are brought on behalf of a class of Plaintiffs who participated in BellSouth's Direct Stock Purchase and Dividend Reinvestment Plan ("DRP") during the Class Period (the "DRP Plaintiffs").[2] (Compl.¶¶ 1, 300.)

#### 2. Defendants

Defendant BellSouth is a communications company that provides voice and data services to more than forty-six million customers in the United States and fifteen other countries. (Compl. ¶ 22; Defs.' Mot. to Dismiss at 4.) BellSouth reported billions of dollars in revenue and net income during the class period: during the period 2000 to 2002, BellSouth averaged annually approximately $24 billion in revenue and a net pretax income in excess of $5 billion. (Compl. ¶¶ 260, 268; Defs.' Mot. to Dismiss at 5.)

Defendant F. Duane Ackerman ("Ackerman") was at all relevant times BellSouth's Chairman, President and Chief Executive Officer. (Compl. ¶ 23.) Plaintiffs allege Defendant Ackerman sold BellSouth stock during the Class Period which resulted in proceeds exceeding $4 million. Defendant Ronald M. Dykes ("Dykes") was at all relevant times BellSouth's Chief Financial Officer. Plaintiffs allege Defendant Dykes received proceeds in excess of $5 million from sale of his BellSouth stock during the Class Period. (Id.) Defendant W. Patrick Shannon ("Shannon") was at all relevant times BellSouth's Vice President—Finance and Principal Accounting Officer. (Id.) Defendant Shannon, Plaintiffs allege, received proceeds in excess of $900,000 from his sale of BellSouth stock during the Class Period. Plaintiffs refer to Defendants Ackerman, Dykes and Shannon collectively as the "Individual Defendants."

Defendants Reuben V. Anderson, J. Hyatt Brown, Armando M. Cordina, and Robin B. Smith (collectively the "Director Defendants") are Directors of BellSouth who Plaintiffs allege signed the DRP Registration Statement. (Id. ¶ 24.) Defen-

---

1. Also before the Court is Defendants' Notice of Supplemental Authority in Support of their Motion to Dismiss the Consolidated and Amended Class Action Complaint [94].

2. The DRP Plaintiffs are also members of the class asserting the Exchange Act claims. Only the DRP Plaintiffs allege violations of the Securities Act.

dant BellSouth, the Individual Defendants and the Director Defendants are sometimes collectively referred to as the "Defendants."

### B. *Plaintiffs' Allegations*

Plaintiffs claim Defendants made a series of false and misleading statements that indicate a "pervasive and systemic accounting fraud." (Pls.' Resp. at 1.) They allege the Defendants' acts violated Generally Accepted Accounting Principles ("GAAP"),[3] falsely increased BellSouth's reported revenues, and avoided or delayed charges that reduced earnings. This, Plaintiffs assert, caused BellSouth's financial statements to be false and misleading, and thereby artificially inflated the price of BellSouth's securities, causing damage to Plaintiffs. (Compl. ¶¶ 257–276.) Plaintiffs allege five categories of misconduct by Defendants.

### 1. *Failure to Take Reserve for Litigation Contingency*

On July 7, 2000, the Florida Public Service Commission ("Florida PSC") issued an order finding that BellSouth's July 9, 1999 tariff filing, in which it restructured its late payment charge, violated Section 364.051(5)(a) of the Florida Statutes. (Compl. ¶ 12.) BellSouth timely petitioned for a hearing on the Florida PSC's findings, which permitted it to continue to collect the late payment fees pending its challenge to the Florida PSC ruling. (*Id.* ¶ 154.)

On November 7, 2000, BellSouth filed its Form 10–Q with the Securities and Exchange Commission ("SEC") for the quarter and nine months ending September 30, 2000. (Compl. ¶ 156.) The Form 10–Q stated:

Also in July 2000, the Commission determined that our change in 1999 from a late charge based on a percentage of the amounts overdue to a flat rate fee plus an interest charge violated the Florida price regulation statute and voted that certain monies should be refunded. We protested the decision, and hearings are scheduled for late 2001.

(Compl. ¶ 156.) BellSouth made nearly identical disclosures in its 2000 Form 10–K filed with the SEC on March 2, 2001. (*Id.* ¶ 157.) Plaintiffs claim these statements to the SEC were misleading because BellSouth failed to disclose (a) the amount of late fees that would have to be refunded; (b) it was permitted to and was continuing to charge late payment fees; and (c) it had not established a reserve for the refund of its late payment fees. (*Id.* ¶ 159.)

On August 30, 2001, the Florida PSC, following the hearing requested by BellSouth, affirmed in a final order that BellSouth's late payment charges violated the Florida Statutes. (*Id.* ¶¶ 12, 162–163.) Plaintiffs claim the Florida PSC ordered BellSouth to stop collecting the disputed late charges and to refund all amounts collected. (*Id.* ¶¶ 163–64.) However, on December 6, 2001, the Florida PSC granted BellSouth's Motion for Stay of Order Pending Judicial Review, which permitted BellSouth to continue to assess the disputed late payment charges pending BellSouth's appeal to the Florida Supreme Court. (*See* Defs.' Mot. to Dismiss, Ex. 6.)

In its September 30, 2001 Form 10–Q filed with the SEC on November 5, 2001, BellSouth stated:

Also in 2000, the Florida Public Service Commission issued a proposed agency action stating that our change in 1999 from a late charge based on a percent-

---

**3.** Generally Accepted Accounting Principles ("GAAP") "are the conventions, rules and procedures that constitute the professional standards of the accounting profession." *In re Miller Indus., Inc. Sec. Litig.*, 12 F.Supp.2d 1323, 1328 (N.D.Ga.1998).

age of the amounts overdue to a flat rate fee plus an interest charge violated the Florida price regulation statute and voted that approximately $65 [million] should be refunded. We protested the decision. On August 30, 2001, the Commission issued an order adopting its proposed action. We have appealed to the Florida Supreme Court and continue to collect the charges subject to refund. (Compl. ¶ 167.) BellSouth's subsequent Form 10–K and 10–Q filings with the SEC made similar disclosures, and added the following information:

... The total amount as of December 31, 2001 subject to potential refund was $83 [million], including interest. No accrual has been recorded in these financial statements related to this matter. (Compl. ¶ 168 (citing 2001 Form 10–K, filed February 28, 2002).)

... The total amount as of March 31, 2002 subject to potential refund was $91 [million], including accrued interest. No accrual has been recorded in these financial statements related to this matter. (Compl. ¶ 169 (citing March 31, 2002 Form 10–Q, filed May 3, 2002).)

... The total amount as of June 30, 2002 subject to potential refund was $100 [million], including accrued interest. No accrual has been recorded in these financial statements related to this matter. (Compl. ¶ 170 (citing June 30, 2002 Form 10–Q, filed August 2, 2002).)

Plaintiffs claim BellSouth's statements to the SEC were misleading because BellSouth failed to disclose (a) it had not established a contingency reserve for the "probable refund"; (b) that it was continuing to charge late payment fees; and (c) its future exposure in the event of a negative result on appeal. (*Id.* ¶ 171.)

On October 31, 2002, the Florida Supreme Court, by a five to two decision, upheld the Florida PSC's order. *See Bell-South Telecomms., Inc. v. Jacobs*, 834 So.2d 855 (Fla.2002). On that same day, BellSouth issued a press release in "PRNewswire–First Call," announcing the court's decision, that it would be required to refund certain late fees charged to Florida customers, and would record a charge to third quarter earnings in the amount of $114 million. (Compl. ¶¶ 172–173.) Plaintiffs allege that BellSouth's continued assessment of late fees and failure to record a reserve against its late payment charges, while BellSouth's challenge to the Florida PSC's decision was pending, violated GAAP, and "had the effect of overstating revenues, income and earnings from the beginning of the Class Period until the charge was taken by BellSouth on October 31, 2002." (Pls.' Resp. at 5; Compl. ¶¶ 14, 176.)

2. *Failure to Write Down Latin American Goodwill*

On July 22, 2002, BellSouth issued a press release announcing its second quarter 2002 earnings, and disclosing it was writing off $1.277 billion of goodwill associated with its Latin American operating segment. (Compl. ¶¶ 15, 180–181.) Plaintiffs allege BellSouth violated GAAP "through its failure to recognize [prior to 2002] an impairment loss for goodwill relating to its Latin American operating segment." (*Id.* ¶ 177.) Plaintiffs allege this failure resulted in BellSouth overstating its earnings and intangible assets from at least 1999, "when the economic, political and regulatory events in Latin America began to adversely affect the segment's results of operations ...," until it disclosed the impairment of goodwill in July 2002. (*Id.*)

Plaintiffs cite numerous public disclosures by BellSouth which Plaintiffs claim demonstrate BellSouth's knowledge of deteriorating conditions in Latin America prior to July 2002. For example, Bell-

South's Form 10–Q for the period ended June 30, 2000, states: "Economic, social and political conditions in Latin America are, in some countries, unfavorable and volatile, which may impair our operations. These conditions could make it difficult for us to continue development of our business and generate revenues or achieve or sustain profitability." (Compl. ¶ 183 (emphasis omitted).) Plaintiffs claim: "Although BellSouth had overwhelming actual knowledge of the impact of the Latin American economic, political and regulatory climate on its financial results, it misled the market by not writing down its impaired goodwill associated with its Latin American operations." (*Id.* ¶ 185.) This failure, Plaintiffs claim, violated BellSouth's own policy, as stated in the 2001 Form 10–K:

> We review long-lived assets for impairment *whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.* It is reasonably possible that these assets could become impaired as a result of technological or other industry changes. . . .

(Compl. ¶ 245.) Plaintiffs claim statements such as these were false and misleading because BellSouth ignored the factors that should have triggered its review for impairment.[4] In short, Plaintiffs allege BellSouth's violations of GAAP by failing to devalue its Latin American goodwill in a timely manner caused BellSouth to have "effectively overstated reported income and assets in at least 1999, 2000, 2001, and part of 2002." (*Id.* ¶ 256.)

### 3. *Failure to Timely Adopt SAB 101*

On February 19, 2003, BellSouth announced a change in its method for recognizing revenues and expenses in its directory publishing business, announcing further that it was taking a $500 million charge to income. (Compl. ¶ 115; Pls.' Resp. at 3.) Before 2003, BellSouth recognized advertising and publishing revenues and expenses according to the issue basis method. This method recognized all revenues and expenses associated with the publication of its directories at the time the directories were published.[5] (Compl. ¶ 115.) In 2003, BellSouth converted to the deferral method, which amortizes revenues and expenses over the life of the directories. (*Id.*) Plaintiffs note that SEC Staff Accounting Bulletin ("SAB") 101, published at the end of 1999, provided guidance regarding revenue recognition policies, and Plaintiffs allege the Bulletin required BellSouth to switch to the deferral method in the beginning of 2000. (Compl. ¶¶ 9, 122.) By failing to change expense and revenue recognition methods in 2000, Plaintiffs allege BellSouth violated GAAP by using the issue basis method which allowed it "to time the publication of its Yellow Pages directories to manipulate when revenue and income would be recognized." (*Id.* ¶ 9.) In support of their allegations, Plaintiffs note that BellSouth previously decided to apply the deferral methodology for recognition of expenses and revenues for service installation and activation fees.

Plaintiffs cite a variety of statements by the company as materially false or mis-

---

**4.** Plaintiffs further allege BellSouth obviously knew of the impact of political and economic problems in Latin America and thus their effect on the company's goodwill because BellSouth delayed its application to offer a Latin American tracking stock, and ultimately withdrew the application on September 25, 2002. (Compl. ¶¶ 15, 192.) The tracking stock would have tracked BellSouth's performance in Latin America separate from BellSouth's general performance.

**5.** BellSouth publishes telephone directories through its subsidiary BellSouth Advertising and Publishing Company ("BAPCO").

leading regarding BellSouth's expense and revenue recognition method for its directory publishing operations. The following examples are illustrative:

1. *February 19, 2003 announcement:* "BellSouth announced ... [it] will change from the issue basis method to the deferral method...." (Compl. ¶ 115 (emphasis omitted).)

 Plaintiffs claim this announcement was misleading because (1) BellSouth did not "affirmatively admit" that the change should have been made two years before and (2) BellSouth failed to disclose it had previously adopted SAB 101 for its installation and activation fees. (Compl. ¶ 116.)

2. *Form 10–K for year ended December 31, 2000:* "Revenues are recognized when *earned*. ... Print advertising and publishing revenues and related directory costs are recognized upon publication of directories. ... Revenues from installation and activation activities are deferred and recognized over the life of the customer relationship ...*." (Compl. ¶ 126.)

 Plaintiffs claim this was misleading because BellSouth "knew and/or recklessly disregarded that its advertising and publishing revenues were not earned at the time of publication under SAB 101." (Compl. ¶ 127.)

3. *January 22, 2001 earnings release:* "[W]e adopted a new method of recognizing revenues and expenses *derived from installation and activation activities. We did this to comply with new accounting guidance contained in SAB 101* ...." (Compl. ¶ 131.)

 Plaintiffs claim this was misleading because it "suggests to investors that SAB 101 applies *only* to its installation and activation services." (Compl. ¶ 132.)

4. *Overstatement of Unbilled Receivables and Understatement of Bad Debt Reserves of Advertising and Publishing Revenues*

On April 19, 2002, BellSouth announced its financial results for the first quarter of 2002. (Compl. ¶ 84.) When it did, BellSouth announced that its advertising and publishing subsidiary, BAPCO, had overstated its unbilled receivables balance by $163 million. (*Id.* ¶¶ 84–85.) Plaintiffs claim the most significant cause of the overstatement of unbilled receivables was BAPCO's migration to a new computer system in 2000, resulting in many customers not being billed. (*Id.* ¶ 89.) Plaintiffs allege the overstatement of unbilled receivables was confirmed when "customers stated, during collection calls, that they had not received a bill." (*Id.*) Plaintiffs contend BAPCO's management acted wrongfully when it did not write off the revenue represented by amounts due from customers who had not been billed, but instead tried to bill them for the amounts they owed. (*Id.* ¶ 90.) Plaintiffs claim "BellSouth *never cured* the inadequacy of its disclosures regarding its accounting policy for, and the nature of, its unbilled receivables," and that this violates GAAP. (*Id.* ¶ 92.)

Plaintiffs next claim BellSouth announced an increase in its bad debt expense in July 2002, as a result of employees booking advertising revenues they knew might not be collectible. (Compl. ¶¶ 93–111.) This allegedly uncollectible advertising revenue, Plaintiffs claim, constituted an unspecified part of the total bad debt expense of $255 million reported by the company for the quarter ended June 30, 2002. (*Id.* ¶ 111.) Plaintiffs assert that employees knew advertising revenue they were reporting was not collectible because sales representatives utilized numerous "questionable sales practices," in-

volving booking revenues when a sale was not complete. This, Plaintiffs claim, necessarily made the collection of these advertising fees uncertain. These questionable sales practices, Plaintiffs allege, arose from employees trying "to meet impossible sales targets set by management." (Pls.' Resp. at 4; Compl. ¶¶ 11, 93–111.) Plaintiffs claim the company's lack of internal controls permitted these questionable practices among the company's sales force. (Compl. ¶¶ 106–108.) Ultimately, Plaintiffs allege, these practices "render[ ] reported revenues and overall results of operations materially false and misleading throughout the Class Period." (*Id.* ¶ 110.)

### 5. *Overbilling Practices*

Plaintiffs assert that numerous other overbilling practices artificially inflated BellSouth's revenues and ultimately caused the Company to announce a bad debt expense of $255 million for the quarter ended June 30, 2002. (Pls.' Resp. at 24.) These allegedly improper practices include (a) overbilling hundreds of Competitive Local Exchange Carriers ("CLECs"), including Supra Telecommunications and Information Services, Inc. ("Supra"), (Compl. ¶¶ 39–69); (b) overbilling residential customers through fraudulent repair and maintenance billing schemes, (*id.* ¶¶ 70–72); and (c) causing employees to engage in fraudulent insurance billing practices. (*Id.* ¶¶ 80–83.)

The Telecommunications Act of 1996 requires carriers such as BellSouth to share local public switched networks with local competitors. (Compl. ¶¶ 5, 39.) Plaintiffs claim that BellSouth arbitrated a dispute with one particular CLEC, Supra, regarding claimed overbilling of Supra for access to BellSouth's switched networks. At issue was whether more expensive "tandem switch" rates or less expensive "switch-to-switch" rates should have been applied. (Pls.' Resp. at 23.) Plaintiffs claim BellSouth billed Supra as if all calls had gone through the tandem switch, while in reality only 10%–15% of the calls actually were processed through a tandem switch. (*Id.*)

Plaintiffs assert the arbitration panel found that BellSouth "breached [its agreement with Supra] in material ways and did so with the tortious intent to harm Supra." (Compl. ¶ 7.) The result, Plaintiffs claim, is that BellSouth overbilled Supra by at least $53 million, possibly as much as $97.5 million. (*Id.*) Plaintiffs allege further that BellSouth has overcharged many other CLECs, albeit in ways different from the way they allege Supra was overbilled.[6] Plaintiffs claim BellSouth was able to recognize improperly hundreds of millions of dollars in revenue during the Class Period because BellSouth had more than nine hundred of these CLEC contracts in force as of July 9, 2003. (Compl. ¶¶ 7–8, 42–43, 53–54.) These overbillings, Plaintiffs claim, account for an unspecified portion of the $255 million bad debt expense for the second quarter ending June 30, 2002. (*Id.* ¶ 111.) Plaintiffs claim these practices "resulted in BellSouth's reporting improperly inflated revenues, violated the federal securities laws," and resulted in the "improper recognition of hundreds of millions of dollars by BellSouth." (Compl. ¶¶ 44, 54.)

Plaintiffs also claim BellSouth "engaged in a fraudulent repair and maintenance

---

**6.** Plaintiffs cite to two other CLECs as "victim[s of] the Company's practice of overbilling." (Compl. ¶ 55.) Choice Telecom, Plaintiffs claim, was overbilled for repair service. Plaintiffs claim Choice Telecom's auditor came to this conclusion after examining BellSouth's invoices. (*Id.* ¶¶ 55–60.) Plaintiffs also claim Florida Digital Networks was overcharged for services. In support, Plaintiffs cite to an FCC filing made by a consumer activist that makes similar allegations, and a similar complaint filed by Florida Digital Networks that was ultimately dismissed without prejudice after mediation. (*Id.* ¶¶ 61–69.)

billing scheme . . . designed to improperly increase BellSouth's revenues, income and earnings improperly, thereby artificially inflating the price of BellSouth securities in the marketplace during the Class Period." (*Id.* ¶¶ 70, 72.) Specifically, Plaintiffs claim individual technicians were motivated by unreasonable production quotas to fraudulently bill customers, by coding external line problems as internal problems, allowing BellSouth wrongfully to bill the customer for the visit. (*Id.* ¶ 75.) Plaintiffs claim numerous technicians complained about this practice "to their managers who, in turn, complained to senior management," and a security administrator was sent to investigate these complaints. (*Id.* ¶ 79.)

Lastly, Plaintiffs claim a former service technician, who worked for BellSouth for three years, was encouraged by his supervisor to replace old cables and falsely claim the cables were destroyed by a storm, a loss covered by insurance. (*Id.* ¶¶ 80–81.) This fraudulent insurance scheme allowed BellSouth, Plaintiffs claim, to avoid unspecified expenses it was required to incur by passing costs associated with cable replacement to the insurer, thus allowing BellSouth to "artificially reduce its capital expenditures and report higher income and earnings." (Compl. ¶¶ 80–83.)

Plaintiffs claim "[a]ll these improper billing practices were designed to improperly increase BellSouth's revenues, income and earnings, thereby artificially inflating the price of BellSouth's securities in the marketplace during the Class Period." (Compl. ¶ 72.)

### C. *Alleged Violations of Securities Laws*

Plaintiffs allege five counts based on the above claimed misconduct of the Defendants. In Count I, Plaintiffs seek damages under Section 10(b) of the Exchange Act for various alleged false and misleading statements. Count I is asserted against BellSouth and the Individual Defendants. In Count II, Plaintiffs seek damages against the Individual Defendants under Section 20(a) of the Exchange Act on the ground they are "control persons" of BellSouth and thus liable for the alleged violations in Count I.

In Count III, the DRP Plaintiffs seek damages under Section 11 of the Securities Act on the ground that the DRP Registration Statement[7] was materially false and misleading for the reasons set forth in Count I. Count III is asserted against all Individual Defendants (except Defendant Shannon) and all Director Defendants as signatories of the DRP Registration Statement. In Count IV, the DRP Plaintiffs seek rescission under Section 12(a)(2) of the Securities Act of the purchases made pursuant to the DRP Registration Statement. Count IV is brought against only BellSouth. Finally, in Count V, the DRP Plaintiffs seek damages against the Individual Defendants under Section 15 of the

---

**7.** Plaintiffs allege the DRP Registration Statement, of which the Prospectus was a part, was issued on March 1, 1997. On May 17, 1999 and June 25, 2001, the Company updated the Prospectus. The June 25, 2001 Prospectus incorporated by reference BellSouth's 10–K for the year ended December 31, 2000, the 10–Q for the quarter ended March 31, 2001, and the following future filings: 10–Q for the quarter ended June 30, 2001; 10–Q for the quarter ended September 30, 2001; 10–K for the year ended December 31, 2001; and 10–Q for the quarter ended March 31, 2002. Accordingly, Plaintiffs claim, the information contained in all these SEC filings, incorporated by reference in the June 25, 2001 Prospectus, as well as BellSouth's Form 10–Q's for the quarters ending September 30, 2000, June 30, 2002, and September 30, 2002, were materially false and misleading, thereby rendering the DRP Registration Statement materially false and misleading. (Compl. ¶¶ 300–306.)

Securities Act on the ground they are liable as "control persons" of BellSouth for its alleged violations in Counts III and IV.

### D. Defendants' Motion to Dismiss

Defendants contend the Complaint should be dismissed for three reasons. First, Defendants claim Plaintiffs have not met their burden of showing Defendants' public disclosures were false or materially misleading at the time they were made. Second, Defendants contend Plaintiffs' claims under Section 10(b) fail because Plaintiffs have not pleaded sufficient facts to give rise to a strong inference of scienter as required by the Private Securities Litigation Reform Act. Third, Defendants contend Plaintiffs' control person claims under Section 20 of the Exchange Act and Section 15 of the Securities Act fail because Plaintiffs have not adequately pleaded a primary violation.

## II. STANDARD OF REVIEW

### A. Standard of Review for Motion to Dismiss

A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). On a motion to dismiss, the allegations contained in the complaint must be accepted as true and the facts and all inferences must be construed in the light most favorable to the plaintiffs. *See Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir.1998); *Cooper v. Pate*, 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); *Conner v.*

*Tate*, 130 F.Supp.2d 1370, 1373 (N.D.Ga. 2001) (Thrash, J.). However, in all cases, plaintiff must not simply make bare assertions of legal conclusions. "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir.2002).

### B. Standard of Review for Federal Securities Fraud Case

#### 1. Expanded Evidence Considered

■ When considering a motion to dismiss in a securities fraud case, the Court may take judicial notice of the contents of relevant public documents that were required to be filed with the Securities Exchange Commission ("SEC") and were actually filed. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir.1999). The Court may also consider evidence outside the pleadings that is undisputedly authentic and on which plaintiffs specifically relied in the complaint. *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir. 1999).

#### 2. Heightened Pleading Requirements

■ To survive a motion to dismiss, allegations of securities fraud must satisfy the requirements of Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that allegations of fraud be pleaded with particularity. Rule 9(b)'s requirements apply to claims under Section 10(b) and Rule 10b–5.[8] *See, e.g., In re Towne Servs. Inc. Sec. Litig.*, 184 F.Supp.2d 1308, 1316 (N.D.Ga. 2001). Rule 9(b) requires plaintiffs to plead "such matters as the time, place and

---

**8.** It is unclear whether Rule 9(b)'s pleading requirements apply to Plaintiffs' claims under Sections 11 and 12(a)(2). *See In re AFC Enters., Inc. Sec. Litig.*, 348 F.Supp.2d 1363, 1376–77 (N.D.Ga.2004) (Thrash, J.) (compiling cases and noting majority view is that

Rule 9(b) applies to Section 11 and 12 claims that "sound in fraud"). For the purposes of considering Defendants' Motion to Dismiss, the Court has applied the heightened pleading requirements of Rule 9(b) to Plaintiffs' Sections 11 and 12(a)(2) claims.

contents of false representations, as well as the identity of the person making the misrepresentation[9] and what was obtained or given up thereby.... [C]oncluslory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 549–50 (8th Cir. 1997) (dismissing complaint because plaintiffs' allegation of fraud "is simply not particularized") (quotation omitted). Essentially, Rule 9(b) requires plaintiffs in a securities fraud case to specify the who, what, where, when, why and how of the alleged fraud. *See In re World Access, Inc. Sec. Litig.,* 119 F.Supp.2d 1348, 1353 (N.D.Ga.2000).

In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4, which reinforces the heightened pleading requirements of Rule 9(b), and imposes additional requirements for plaintiffs in securities fraud cases. First, the PSLRA requires a plaintiff to specify each statement or omission alleged to be misleading, the reason why the statement or omission is misleading and the facts surrounding the alleged misrepresentation. 15 U.S.C. § 78u–4(b)(1). Second, to survive a motion to dismiss, the PSLRA requires plaintiff, "with respect to each act or omission ... [to] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). If the

plaintiff does not satisfy the PSLRA's pleading requirements, then the Court must dismiss the complaint. *See* 15 U.S.C. § 78u–4(b)(3)(A). "Essentially, a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re World Access, Inc. Sec. Litig.,* 119 F.Supp.2d at 1353.

These heightened pleading requirements under the PSLRA serve important ends: "In securities fraud suits, this heightened pleading standard provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994).

### C. *Elements of Plaintiffs' Claims*

#### 1. *Exchange Act Claims*

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security[,] ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe...." 15 U.S.C. § 78j(b). Rule 10b–5 of the Securities Exchange Commis-

---

**9.** Defendants do not contend that Plaintiffs' claims should be dismissed because Plaintiffs fail to attribute particular statements to particular individuals. Plaintiffs apparently rely on the group pleading doctrine to plead that certain statements conveyed in the company's releases are the collective actions of the Individual Defendants. The Eleventh Circuit has not definitively ruled on the continuing viability of the group pleading doctrine after the enactment of the PSLRA. The Court finds that the doctrine necessarily applies and Plaintiffs have pleaded claims against the In-

dividual Defendants. *See, e.g., In re AFC Enters., Inc. Sec. Litig.,* 348 F.Supp.2d at 1371 (finding group pleading doctrine remains viable in appropriate circumstances). Application of the doctrine is particularly fair and appropriate in this case in which the alleged misrepresentations are contained in releases in which the Individual Defendants—as Chief Executive Officer, Chief Financial Officer, and Vice President of Finance and Principal Accounting Officer—were necessarily involved and under whose authority they were issued.

sion, promulgated under Section 10(b) of the Exchange Act, makes it unlawful:

> (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1995). To state a securities fraud claim under Rule 10b–5, the Eleventh Circuit has held a plaintiff must demonstrate (1) a misstatement or omission, (2) of a material fact, (3) made with scienter or intent to defraud, (4) in connection with the sale of securities, (5) upon which plaintiff relied, and (6) that proximately caused plaintiff's injury. *Bryant*, 187 F.3d at 1281. The Eleventh Circuit has found that to satisfy the scienter requirement, "a securities fraud plaintiff must plead scienter with particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner." *Bryant*, 187 F.3d at 1287. "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Theoharous v. Fong*, 256 F.3d 1219, 1224–25 (11th Cir.2001) (quotations and citations omitted).

Section 20(a) provides liability for a "controlling person" where an Exchange Act violation is found. 15 U.S.C. § 78t(a). To successfully allege control person liability under Section 20(a), plaintiff must allege that (1) the company violated Section 10(a), (2) the defendant had the power to control the general affairs of the company, and (3) the defendant had the power to control the specific corporate policy that resulted in the primary violation. *See Theoharous*, 256 F.3d at 1227. A defendant is not liable as a control person under Section 20(a) unless a primary violation of the securities laws is proved. *Id.*

### 2. Securities Act Claims

In the Eleventh Circuit, liability under Sections 11, 12 and 15 of the Securities Act is described as follows:

> Section 11(a) of the 1933 Act, 15 U.S.C. § 77k, provides a cause of action to purchasers of securities where: "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. . . ." Section 11 extends liability to every person who signed the registration statement, the issuer's directors, and every underwriter. Section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l, imposes liability upon one who sells a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. . . ." Section 15 of the 1933 Act, 15 U.S.C. § 77o, extends Section 11 and 12 liability to persons who control entities liable under those sections.

*Oxford Asset Mgmt., Ltd.*, 297 F.3d at 1188–89. In summary, to state a claim under Sections 11 and 12 of the Securities Act, a plaintiff must properly allege that he purchased a security issued pursuant to a registration statement, prospectus or

oral communication, and that the statement, prospectus or oral communication included a material misrepresentation or omission.[10] These sections do not include a scienter requirement and essentially impose strict liability for material misinformation contained in or omitted from a registration statement or prospectus. *See In re Unicapital Corp. Sec. Litig.,* 149 F.Supp.2d 1353, 1363 (S.D.Fla.2001); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements.").

As with Section 20 claims, control person liability under Section 15 is contingent upon a plaintiff proving a primary violation. If plaintiff does not establish a primary violation under Sections 11 or 12, dismissal of his Section 15 claim is warranted.

## III. *DISCUSSION*

Defendants move to dismiss Plaintiffs' complaint on three grounds. First, Defendants claim all of Plaintiffs' claims should be dismissed for failure to allege any material misstatement or omission. Second, Defendants claim Plaintiffs' Exchange Act claims should be dismissed because Plaintiffs have failed adequately to allege scienter. Finally, Defendants claim Plaintiffs' control person claims under Sections 15 and 20 should be dismissed because Plaintiffs failed to establish a primary violation of the securities laws. The Court is required to apply these grounds to the five categories of alleged misrepresentations and omissions described above.

### A. *Pleading Requirements*

Plaintiffs initially must satisfy the pleading requirements for each of their alleged claims of securities violations. As noted above, the PSLRA requires Plaintiffs to identify the specific statements or omissions alleged to be misleading, articulate the reasons why each statement or omission was misleading, and identify the time, place and context of each allegedly misleading statement. In short, Plaintiffs must set forth the "who, what, when, where, and how" of the Defendants' allegedly fraudulent behavior. *See In re World Access, Inc. Sec. Litig.,* 119 F.Supp.2d at 1353. These heightened requirements apply to both Plaintiffs' Exchange Act claims and their Securities Act claims that "sound in fraud." *See In re AFC Enters., Inc. Sec. Litig.,* 348 F.Supp.2d at 1376–77 (noting majority rule that section 11 claims sounding in fraud are subject to the pleading requirements of Rule 9(b)).

■ Plaintiffs' allegations satisfy these heightened requirements. Plaintiffs have identified specific statements they allege to have been misleading. First, in regards to the Florida late fee charge litigation, Plaintiffs claim specific statements from the Form 10–Q and 10–K disclosures filed with the SEC were misleading, and specifically allege the manner in which they misled investors. Second, Plaintiffs claim Defendants' failure to write down Latin American goodwill caused BellSouth's financial results issued during the Class Period to have materially overstated BellSouth's assets. Plaintiffs also claim the company's 2001 Form 10–K misled investors by stating the company performed an impairment review whenever triggering events occur, indicating that political and economic events in Latin America were the kind of triggering events that would

---

**10.** The DRP Plaintiffs base their claims on alleged statements or omissions made in the DRP Registration Statement, Prospectuses, and incorporated SEC filings.

cause an impairment review to be performed. Third, Plaintiffs identify specific statements in public announcements, earnings releases, and Form 10–K filings regarding its accounting method for its directory publishing operations which they contend were misleading. Finally, Plaintiffs identify numerous billing and operational practices they contend caused the financial results issued during the Class Period to be materially misstated. Plaintiffs also identify specific GAAP provisions they allege BellSouth violated by its alleged misconduct. Plaintiffs have adequately identified the alleged misleading statements Plaintiffs attribute to Defendants. Having found Plaintiffs satisfied the heightened pleading requirements, the Court now determines whether the alleged misleading statements or omissions were materially false or misleading.

B. *Material Misstatement or Omission*

■ To state a claim under Section 11 or 12 of the Securities Act, or Section 10(b) or Rule 10b–5 of the Exchange Act, a complaint must allege the misstatement or omission of a material fact. *See, e.g., In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n. 10 (3d Cir.1993) (noting materiality requirement is identical under Section 10, Rule 10b–5, Section 11, and Section 12). Plaintiffs and the DRP Plaintiffs allege the various statements and omissions on the five issues asserted in the Complaint are actionable under the Exchange and Securities Acts. Defendants first move to dismiss on the grounds that none of the statements alleged are untrue, and if they were, they are not material.[11]

■ A court, in reviewing a statement alleged to an actionable misstatement or

omission, must scrutinize the nature of the statement or omission to determine whether the statement was false when it was made. If a complaint fails to plead facts that, if true, would constitute a misrepresentation, and does nothing more than offer the legal conclusion that a representation was somehow misleading, dismissal of plaintiff's claims is appropriate. *Oxford Asset Mgmt., Ltd.*, 297 F.3d at 1194. "In other words, if no reasonable investor could conclude public statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law." *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir.2002) (quotation omitted).

■ In addition to being misleading, the alleged misrepresentation or omission must have been material to be actionable under the securities laws. The Eleventh Circuit has held that the materiality element is satisfied if there is a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having "significantly altered the total mix of information made available." *Oxford Asset Mgmt., Ltd.*, 297 F.3d at 1189 (quotation omitted). Put another way, a misstatement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important to an investment decision. *Basic, Inc. v. Levinson*, 485 U.S. 224, 246–47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Conversely, "a fact is immaterial where a reasonable investor could not have been swayed by the misrepresentation." *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d at 897 (quotation omitted).

"The trier of fact usually decides the issue of materiality." *Oxford Asset*

---

11. The materiality analysis is pertinent to the claims asserted under both acts. Under the Securities Act, if one or more of the statements are determined to be material, the

claim survives the Defendants' motion. Those statements, under an Exchange Act analysis, also have to be evaluated under the scienter element of the claim.

*Mgmt., Ltd.,* 297 F.3d at 1189. However, if it is plain that the alleged misstatement or omission lacked importance and reasonable minds could not differ on the question of its importance, it is proper for the court to pronounce a misstatement or omission immaterial as a matter of law. *Oxford Asset Mgmt., Ltd.,* 297 F.3d at 1189; *Parnes,* 122 F.3d at 547 ("Alleged misrepresentations may also present or conceal such insignificant data that, in the total mix of information, it simply would not matter to a reasonable investor."). "In assessing whether a misrepresentation or omission was material, courts may not employ 20/20 hindsight; instead, they must consider whether the misrepresentation or omission was material on the date the prospectus or registration statement was issued." *In re Unicapital Corp. Sec. Litig.,* 149 F.Supp.2d at 1363.

The Complaint avers that during the Class Period the Defendants made deceptive and materially false and misleading statements which, coupled with Defendants' failure to disclose necessary information, caused the company's revenues to be inflated and the stock to trade at artificially inflated prices. The allegations fall into five categories.

1. *Failure to Take Reserve for Litigation Contingency*

 Plaintiffs'[12] GAAP argument focuses on its interpretation of Financial Accounting Standards ("FAS") 5. Paragraph 8 of FAS 5 provides for accrual of a loss contingency when: "(a) [i]nformation available *prior* to issuance of the financial

statements indicates that it is *probable* that an asset has been impaired or a liability has been incurred ..." and "(b) [t]he amount of the loss can be *reasonably estimated.*" (Compl.¶ 216.) *See also In re Boeing Sec. Litig.,* 40 F.Supp.2d 1160, 1177 (W.D.Wash.1998). Plaintiffs contend that the Florida PSC's order made it probable that BellSouth would incur the liability, and that "Defendants should have recorded an accrual for a loss contingency in the amount of the accrued late payment fees as of the adverse Florida PSC decision on July 7, 2000, and at the very latest on August 30, 2001, when the Florida PSC rendered its final decision." (Pls.' Resp. at 8.) By failing to disclose the amount subject to refund, that a contingency reserve for a refund had not been established, and the future potential liability, Plaintiffs allege the Defendants' statements about the dispute with the Florida PSC were misleading and thus actionable.

The Defendants' public disclosures about the Florida late payment fees show the Defendants made truthful statements that were substantial and not misleading and for these reasons the statements are not actionable. BellSouth timely disclosed in public filings the Florida PSC's decision, the status of the company's appeals, updated current amounts subject to potential refund, and that "[n]o accrual has been recorded in these financial statements related to this matter." (*See, e.g.,* Compl. ¶ 170 (quoting June 30, 2002 Form 10–Q).)[13] Specifically, BellSouth's 2002 Form 10–Q stated that the current amount as of June 30, 2002, subject to potential refund was $100 million.[14] After the Florida Su-

---

12. For the purposes of the Court's analysis of the materially misleading element and because the Plaintiffs and the DRP Plaintiffs both claim the five categories of statements are material misrepresentations or omissions, Plaintiffs shall include the DRP Plaintiffs.

13. In its 2001 Form 10–K, BellSouth commented that accounting decisions in regards

to litigation contingencies are "inherently uncertain" and "require management's most difficult, subjective or complex judgments...." (Defs.' Mot. to Dismiss, Ex. 7 at 7.)

14. Plaintiffs virtually abandon any argument that BellSouth should have disclosed more information after the initial Florida PSC deci-

preme Court upheld the Florida PSC's order, BellSouth immediately disclosed the court's decision and the extent of the pretax charge of $114 million it would be required to make. (Compl. ¶ 173.) These series of disclosures and the specificity with which they were made compel the Court to conclude they gave the investing public, during the pendency of the dispute, a clear picture of the dispute, its magnitude and the economic consequences if BellSouth did not prevail.[15]

"Generally, the issue of whether a public statement is misleading is a mixed question of law and fact for the jury. The issue is appropriately decided as a matter of law, however, when reasonable minds could not differ. In other words, if no reasonable investor could conclude public statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law." *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d at 897 (quotation omitted). Viewing the nature of the disclosures made and taking them together, in context, the Court finds BellSouth fully disclosed its business and accounting judgments on the issue of Flor-

ida late fee assessments at all pertinent times in its public disclosures. Consequently, no reasonable investor could have been misled, as Plaintiffs claim, when investors were not told the fees were not being accrued or the amount of the accrual. *See Parnes*, 122 F.3d at 548 ("Clearly, any reasonable investor would be on notice that Gateway faced potential state tax liability ... and could not have been misled by the prospectus to believe that Gateway did not face such potential liability."). In short, the company's financial statements were not misleading.[16]

Considering all facts alleged by Plaintiffs as true, the Court finds (i) any alleged misstatement or omission could not have been material because, in light of the quality of the company's disclosures, any additional disclosures could not have altered the "total mix" of information available to an investor, and (ii) Plaintiffs have failed to state a claim against Defendants for securities violations in relation to the Florida late payment fees litigation. *See Oxford Asset Mgmt., Ltd.*, 297 F.3d at 1193 (finding Defendants' disclosures sufficient to render statements not misleading; "In

---

sion on July 7, 2000, as opposed to disclosing information after the Florida PSC's final order. (*See* Pls.' Resp. at 8 (Defendants should have recorded an accrual for a loss contingency "on July 7, 2000, *and at the very latest on August 30, 2001* ....") (emphasis added).) The Court views BellSouth's decision to disclose the amount of the possible refund on the later date in August 2001 as appropriate in view of the preliminary nature of the July 2000 action. *See BellSouth Telecomms., Inc.*, 834 So.2d at 857 (characterizing the July 2000 decision as a "proposed action," and the August 2001 decision as a "final order").

15. BellSouth believed it would prevail on its appeal in the Florida Supreme Court. The strong dissent by two justices of the Florida Supreme Court stating the majority's decision "defies logic," *BellSouth Telecomms., Inc.*, 834 So.2d at 860, and the Florida PSC's determination was "clearly erroneous," *id.*, sup-

ports that it was not probable that liability had been incurred. In fact, even the majority noted that "the statute at issue in the instant case is not a paragon of clarity...." *Id.* at 859. There being a reasonable basis for not accruing late fee charges when either of the Florida PSC's orders was entered, it follows Defendants were not required to disclose that accruals were not being made.

16. Plaintiffs admit a violation of GAAP is not in and of itself sufficient to survive a motion to dismiss. *See also Smith v. Circuit City Stores, Inc.*, 286 F.Supp.2d 707, 719 (E.D.Va. 2003) ("GAAP is a term of art encompassing a wide range of acceptable procedures."). Whether BellSouth should or should not have accrued a loss contingency prior to the Florida Supreme Court is debatable, and BellSouth's fully-disclosed judgment, even if incorrect, does not give rise to a violation of the securities laws.

view of this and other candid statements about [the possible problems] that appear in the prospectus, we hold that the prospectus was not misleading in this respect."); *In re Allied Capital Corp. Sec. Litig.*, No. 02–cv–3812, 2003 WL 1964184, at *5 (S.D.N.Y.2003) (granting motion to dismiss because "[defendant]'s actual valuation policies were public, as was all adverse information about the companies in which [defendant] had invested, plaintiffs have not alleged that [defendant] concealed any facts from its investors."); *In re Boeing Sec. Litig.*, 40 F.Supp.2d at 1177–78 (granting motion to dismiss because "Plaintiffs' allegations, even if accepted as true, raise no more than a challenge to Boeing's judgment.").

### 2. *Failure to Write Down Latin American Goodwill*

■ Plaintiffs next contend that BellSouth materially overstated its goodwill and reported earnings, rendering its financial statements false and misleading. Plaintiffs allege BellSouth was aware of the problems in its Latin American segment, and "failed to perform an impairment review," as required by GAAP. In doing so, BellSouth failed to take timely necessary action to realize this loss, and its financial reporting misrepresented the value of this asset and the company's financial condition generally. (Pls.' Resp. at 9–10.) The result was that BellSouth, on July 22, 2002, had to write off $1.277 billion of goodwill associated with its Latin American operating segment.

Plaintiffs contend "[t]he numbers speak for themselves," and that the write-down amount "is *prima facie* evidence that … [the] Latin American goodwill was already impaired and overstated in 1999, 2000, and 2001." (Pls.' Resp. at 10–11.) They allege BellSouth's public filings "effectively admit this impairment," (*id.* at 11,) because Defendants acknowledged trouble in the economic, social and political conditions in Latin America during these same years. (*Id.;* Compl. ¶¶ 182–84.) Plaintiffs further evidence that Defendants knew the Latin American goodwill was impaired by noting "BellSouth cancelled its proposed Latin American tracking stock."[17] (*Id.*) Plaintiffs claim BellSouth violated its own policy, as stated in the 2001 Form 10–K, that it "review[s] long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable." (Compl. ¶ 245 (emphasis omitted).) In sum, Plaintiffs contend BellSouth was required to write down hundreds of millions of dollars of goodwill beginning in 1999, and continuing through 2001,[18] because of its knowledge of turmoil in Latin America. (Pls.' Resp. at 11–13.) This failure to write down prior to 2002, Plaintiffs allege, caused BellSouth's assets to be overstated and its financial statements to be materially misleading during this time period.

Defendants contend the write down of goodwill resulted from the company's adoption of FAS 142 on January 1, 2002, and not from an improper application of FAS 121 prior to that time. (Defs.' Mot. to Dismiss at 24–25.) The parties do not dispute that under FAS 121, effective prior to January 1, 2002, the company tested for impairment by comparing "*undiscounted* future cash flows with the carrying amount of the asset," while FAS 142 required BellSouth to use the "future *discounted* cash flows." (*Id.*) The parties do dispute what portion of the write down can be attributed

---

**17.** A "tracking stock" customarily is stock issued for a segment of a company's business, the value of which then tracks the segment's performance.

**18.** The write down of Latin American goodwill actually occurred in 2002.

to the adoption of FAS 142 and whether the company was violating FAS 121 prior to January 1, 2002.[19]

The Court finds that these claims sufficiently allege a material misstatement or omission. Viewing all facts and inferences in the light most favorable to Plaintiffs, Plaintiffs have identified a significant asset that it claims was improperly valued in violation of specific GAAP provisions. Defendants' statement, in the form of reassurance, that it reviews "long-lived assets for impairment," could have led investors to believe Defendants would review developments in Latin America for their impact on BellSouth's Latin American goodwill and adjust its value accordingly. That BellSouth undertook the time and expense of registering a Latin American tracking stock, yet withheld offering the stock to the market, ultimately cancelling it due to "economic and political" uncertainty, evidences the company was aware conditions in the region were significant and were significantly affecting the market for its stock. That the tracking stock was cancelled indicates the effect was material.

It is the Court's opinion that reasonable investors would have considered the devaluation of this goodwill an important criteria and, if disclosed, it would have significantly altered the mix of information available about the company. Accordingly, the Court finds that Plaintiffs have adequately alleged a material misstatement or omission with regards to BellSouth's Latin American goodwill. *See In re Unicapital Corp. Sec. Litig.*, 149 F.Supp.2d at 1364 ("Plaintiff's averments concerning the overvaluation of Unicapital's goodwill sufficiently allege a material

misrepresentation that is adequate to support a claim under §§ 11 and 12(a)(2) of the Securities Act."); *In re World Access, Inc. Sec. Litig.*, 119 F.Supp.2d at 1355 (finding improper practices violating GAAP sufficient to state a claim).

### 3. *Failure to Timely Adopt SAB 101*

■ Plaintiffs allege BellSouth violated SAB 101 when it failed to adopt SAB 101 as its revenue recognition policy for advertising and publishing revenues three years earlier. (Compl. ¶ 114.) On February 19, 2003, BellSouth announced that effective January 1, 2003, it would change from the issue basis method of recognizing revenues in its directory publishing business to the deferral method of revenue recognition. (*Id.* ¶ 115.) Plaintiffs contend the announced change in accounting method was misleading because (a) BellSouth did not "affirmatively *admit* that the change ... should have been made at least two years before," and (b) BellSouth failed to disclose that "it had previously adopted SAB 101 for its installation and activation fees, thereby *conceding* its historical understanding of SAB 101's requirements, and effectively *admitting* scienter in failing to implement it earlier as to its advertising and publishing revenue." (*Id.* ¶ 116.)

Plaintiff also claim previous public statements by BellSouth that it complied with SAB 101 for its installation and activation revenues were misleading because the announcements suggested that SAB 101 applies only to these services, and not directory publication. Finally, Plaintiffs contend BellSouth had notice that it was violating SAB 101 on August 16, 2002, when Qwest Communications' public fil-

---

**19.** Plaintiffs apparently admit that a portion of the write down was necessarily caused by BellSouth's switch in accounting methods from FAS 121, which permits consideration of undiscounted future cash flows in testing for impairment, to FAS 142, which does not allow such consideration. Plaintiffs perform a series of calculations, based on their own assumptions, to estimate that the impairment of goodwill not related to the change in accounting was at least $277 million. (Pls.' Resp. at 12 n. 10.)

ings indicated that Qwest had received comments from the SEC suggesting that directory revenues be recorded using the deferral method of accounting. (Compl. ¶ 145.)

Plaintiffs argue SAB 101 requires that "revenue should not be recognized until it is realized or realizable and earned." (Pls.' Resp. at 13 (quoting SAB 101).) Plaintiffs argue further SAB 101 specifically applies to service contracts requiring a company to recognize revenue "over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer." (*Id.* at 13–14.) Plaintiffs then summarily conclude: "Thus, SAB 101 required BellSouth to recognize its advertising and publishing revenue over the life of the directories generating those revenues, generally twelve months." (*Id.*) To support its interpretation, Plaintiffs rely on the fact BellSouth converted to this method in 2003, had previously converted to the method for installation and activation, and Qwest, which also publishes directories, had previously converted to the deferral method, apparently in response to an SEC demand that it do so, and that BellSouth was aware of Qwest's conversion to the deferral method, the SEC's prompting of it, and yet did not itself convert until over a year later.

Plaintiffs have alleged the conversion was required. BellSouth argues it was discretionary and a matter of business judgment. The Court, however, must view the allegations in the Complaint in the light most favorable to the Plaintiffs and for the purposes of this motion considers Plaintiffs' claim and the facts it asserts to support it as stating a valid claim of securities fraud. The Court cannot conclude that the statements in the company's financial reports would not have been considered by a reasonable investor as misleading, and the Court finds the misrepresentation was material.

Admittedly, finding this claim states a material misstatement is a close call. Plaintiffs here rely principally on conclusory assertions such as "advertising and publishing revenues were *not* earned at the time of publication" under SAB 101. (Pls.' Resp. at 14–15.) Broad assertions like these, absent any cogent explanation on the part of Plaintiffs as to why it is not a reasonable interpretation of the accounting guidelines to consider such revenue as earned at the time of publication, as BellSouth did until 2003, are not sufficient to succeed on this claim. But, the Court observes that Plaintiffs also have alleged at the time that alleged misrepresentations were made, Defendants were aware of the SEC's interpretation of SAB 101, its application to directories, and that a company in the same market as BellSouth, which publishes directories, had applied SAB 101 to its publication operations.[20]

Plaintiffs also allege the statements regarding SAB 101 were misleading, but also allege the company's violation of GAAP caused the financial statements to be misleading. Under the rules that apply in considering a motion to dismiss in securities litigation, the Court is required at this stage to find Plaintiffs have alleged a material misstatement.

### 4. *Overstatement of Unbilled Receivables*

 Plaintiffs allege Defendants "improperly recognized revenue in BellSouth's

---

**20.** BellSouth disclosed to the public in its Form 10–K from 2000 as follows: "Print advertising and publishing revenues and related directory costs are recognized upon publication of directories." (*See* Compl. ¶ 126 (emphasis omitted).) This is an example of the evidence available to Defendants on the issue of materiality that makes a materiality finding here a close one.

advertising and publishing business for 'unbilled receivables'-receivables for which customers had not yet been billed." (Pls.' Resp. at 18; Compl. ¶ 10.) In an April 19, 2002 press release, Defendants admit that its publishing segments' unbilled receivable balance was overstated by $163 million. (Defs.' Mot. to Dismiss at 31.) The parties do not dispute that Defendants misstated their financial statements prior to April 2002.

Defendants argue Plaintiffs fail to state a claim because the misstatement was not material to a reasonable investor. (*Id.*) At the time of the announcement, BellSouth contends that the "discrepancies had accumulated over an extended period of time and that the discrepancies were so small, in relation to BellSouth's billions of dollars of quarterly revenue, that they had not caused its financial results or its operating trends in any prior reporting period to be materially affected." (*Id.* at 32.)

The Court cannot find at this time that the $163 million overstatement of unbilled receivables was not material to the market. Plaintiffs have made sufficient allegations at this early stage in the proceedings to sufficiently allege the materiality of the misstatement. "The trier of fact usually decides the issue of materiality." *Oxford Asset Mgmt., Ltd.*, 297 F.3d at 1189. "[A] fact is immaterial where a reasonable investor could not have been swayed by the misrepresentation." *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d at 897 (quotation omitted). The Court cannot say that no reasonable investor would have found the $163 million misstatement material to the investment decision. The misstatement "must be evaluated as to materiality in light of further facts and more specific

information." *In re Mirant Corp. Sec. Litig.*, No. 02–cv–1467–BBM, slip op. at 39 (N.D.Ga. July 14, 2003) (Martin, J.) (holding alleged misstatements are not immaterial as a matter of law; many factors need to be considered and "require delicate assessments of the inferences a 'reasonable shareholder' would draw ....''); *see also In re Towne Servs. Inc. Sec. Litig.*, 184 F.Supp.2d at 1325 (rejecting defendant's contention that omitted information was not of sufficient magnitude to require disclosure; "[t]his obviously is a fact-sensitive issue").

This conclusion that the Court cannot decide as a matter of law that the disclosure was immaterial is further supported by Plaintiffs' allegations of the disclosure's effect on the price of BellSouth's stock. Plaintiffs have alleged a significant drop in share price and increase in trading activity over the days following the announcement. (Compl. ¶ 87.) Such data frequently indicate materiality, *see In re Miller Indus., Inc. Sec. Litig.*, 12 F.Supp.2d 1323, 1326 (N.D.Ga.1998),[21] and support the Court's conclusion that Plaintiffs have adequately pleaded a material misrepresentation or omission in regards to the unbilled receivables.

### 5. *Understatement of Bad Debt Reserves and Overbilling Practices*

██ Plaintiffs allege a myriad of improper billing practices which they claim artificially inflated BellSouth's revenues, and "ultimately caused the Company to announce a bad debt expense of $255 million for the quarter ended June 30, 2002." (Compl. ¶¶ 5–8, 39–111.) The categories of alleged misconduct involve: (a) overbilling

---

**21.** Defendants contend that within a month of this drop the stock price had fully recovered and was higher than it had been before the announcement. (Defs.' Reply at 16.) This stock price recovery does not necessarily indicate the information was not material. It could be the effect was simply limited or the recovery of the stock price over the period of one month could have been the result of some market or other influence.

hundreds of CLECs, including Supra, (*Id.* ¶¶ 39–69); (b) overbilling residential customers through fraudulent repair and maintenance billing schemes, (*Id.* ¶¶ 70–79); (c) engaging in manipulative sales practices such as booking revenue that was not collectible and submitting the account to "bad pay," (*Id.* ¶¶ 93–105); and (d) causing employees to engage in fraudulent billing of insurance companies, (*Id.* ¶¶ 80–83.) (*See also* Pls.' Resp. at 19–25.)

First, Plaintiffs contend that BellSouth overbilled its CLEC customers. Plaintiffs only example of this conduct is in relation to Supra with which BellSouth appears to have had a protracted dispute over the billing of calls. "[B]ecause BellSouth had more than nine hundred of these CLEC contracts in force as of July 9, 2003," (Pls.' Resp. at 23; Compl. ¶¶ 8, 53–54,) and Bell-South admittedly overbilled Supra by at least $53 million, Plaintiffs assert these overbillings, in the aggregate, account for some of the $255 million bad debt expense for the second quarter ending June 30, 2002. (Compl. ¶ 111.)

The Court finds that Plaintiffs have alleged sufficient facts to support a claim of securities law violations against Defendants with regards to the alleged overbilling of CLECs. Plaintiffs have identified several companies which had specific grievances with BellSouth and specific accounting irregularities during the Class Period, attempted to quantify the financial impact thereof, and connected these improprieties to an arguably material misstatement in the company's financial statements. Thus, this claim states a material misrepresentation sufficient to survive a motion to dismiss. *See, e.g., In re Miller Indus., Inc. Sec. Litig.,* 12 F.Supp.2d at 1329.

Plaintiffs assert numerous other challenges to BellSouth's billing methods and make broad, unspecific, and conclusory claims about their alleged economic impact. (Compl. ¶¶ 70–111.) Plaintiffs claim BellSouth was overbilling residential customers through fraudulent repair and maintenance billing schemes, (*Id.* ¶¶ 70–79,) engaging in manipulative sales practices such as booking revenue that was not collectible and submitting the account to "bad pay," (*Id.* ¶¶ 93–105,) and causing employees to engage in fraudulent billing of insurance companies in the replacement of old cables. (*Id.* ¶¶ 80–83.)

Plaintiffs' allegations to support these claims are insufficient for a variety of reasons. First, Plaintiffs fail to allege any significant connection between the alleged misconduct and errors in BellSouth's financial statements, and thus have failed to allege a materially false or misleading statement or omission. Plaintiffs claim they connect "all these improper billing practices" to BellSouth's overall bad debt expense of $255 million. (Pls.' Resp. at 24.) However, Plaintiffs have simply lumped unrelated activities—from alleged misconduct by repairmen at residences to improper booking of sales by sales representatives—and asserted that these must have combined to account for the bad debt expense. These facts do not adequately state a violation of the securities laws because Plaintiffs do not, and cannot in good faith, plead what effect, if any, these incidents of alleged employee misconduct had on BellSouth's financial results. They have not even alleged what portion of the $255 million bad debt expense is attributable to the conduct claimed. Thus, Plaintiffs have failed to allege any materially false or misleading statements.

Second, Plaintiffs cannot connect the alleged misconduct to any person of significant decision-making authority within the company, let alone anyone responsible for preparing the company's financial statements. For example, Plaintiffs attempt to connect stories from two former low-level

technicians that they used to defraud customers to BellSouth management by claiming "BellSouth set high ... quotas per technician—forcing them to meet these quotas to have good performance ratings...." (Compl.¶ 75.) Plaintiffs do not allege any credible facts sufficient to connect quotas to improper conduct. Similarly, Plaintiffs include allegations from a former low-level sales representative at BellSouth that his division committed wrongful acts because "BellSouth imposed higher and higher—in fact impossible—sales targets on the Small Business division...." (*Id.* ¶ 96.) Plaintiffs make the broad, generalized claim that "BellSouth was very aggressive in pressuring its representatives.... The ultimate goal was to ensure revenue targets were met and surpassed." (*Id.* ¶ 98.) These unsupported and conclusory allegations cannot connect localized allegations of misconduct at the lower levels of the company to management. In fact, they do not even suggest at what level these "goals" were set. They simply suggest, without any proper factual predicate, that performance goals or quotas may result in wrongful conduct which in turn has some unarticulated impact on the company's financial reporting. Moreover, these performance benchmarks are often set in local offices by local supervisors rather than senior or even intermediate level managers. Plaintiffs' allegations not only fail to plead any misleading fact or omission, they also fail to satisfy the materiality element as no reasonable investor could have thought that allegations of localized misconduct by low-level employees altered the "total mix" of information available to a prospective investor. *See Oxford Asset Mgmt., Ltd.*, 297 F.3d at 1189. The fact Plaintiffs do not set the dollar impact of these practices underscores these claims do not meet the mate-

riality requirements under the securities laws.

Lastly, Plaintiffs claim BellSouth's "lack of internal controls" permitted much of this misconduct to take place. (Compl. ¶¶ 106–110.) These allegations are nothing more than criticism of BellSouth's management structure and management decisions, and cannot form the basis for a securities violation. *See In re Premiere Techs., Inc. Sec. Litig.*, No. 98–cv–1804, 2000 WL 33231639, at *15 (N.D.Ga. Dec.8, 2000) (finding allegation of corporate mismanagement not actionable); *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 639–40 (3d Cir.1989) (affirming dismissal of allegations of failure to disclose inadequate accounting controls).

Plaintiffs have failed to allege facts showing false or materially misleading statements or omissions with regard to the Florida late fee litigation, the alleged understatement of bad debt reserves, or the alleged overbilling practices unrelated to the billing of CLECs, and these claims are subject to being dismissed.

### C. *Scienter*

To state a claim for securities fraud under the Exchange Act, a plaintiff must prove scienter, or an intent to defraud. To prosecute those claims which the Court finds state a material misstatement or omission, Plaintiffs must prove each of the Defendants intended to defraud purchasers and sellers of securities when making the material misrepresentations or omissions alleged.[22]

 Furthermore, under the PSLRA, a securities fraud complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required

---

**22.** Scienter is not required to allege a viola- tion of the Securities Act.

state of mind." 15 U.S.C. § 78u–4(b)(2). Although factual allegations may be aggregated to infer scienter, "scienter must be found with respect to each defendant and with respect to each alleged violation." *See Phillips v. Scientific–Atlanta, Inc.,* 374 F.3d 1015, 1017–18 (11th Cir.2004). "[Section] 10(b) was addressed to practices that involve some element of scienter and cannot be read to impose liability for negligent conduct alone." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 201, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Eleventh Circuit requires that:

> [T]he plaintiff must allege particular facts giving rise to a strong inference that the defendant acted in a severely reckless manner. Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Theoharous,* 256 F.3d at 1224–25 (quotations and citations omitted).

■■■ "In order to comply with the heightened pleading requirement of the PSLRA, the amended class action complaint must describe how the defendants acted with severe recklessness in relation to the alleged material misrepresentations and omissions." *In re Unicapital Corp. Sec. Litig.,* 149 F.Supp.2d at 1371. "Since conclusory allegations do not satisfy the pleading requirements of Rule 9(b), the complaint must provide a factual basis for allegations of scienter." *In re K–tel Int'l, Inc. Sec. Litig.,* 300 F.3d at 894 (quotation omitted). Although the PSLRA demands more particularized pleading, the Court on a motion to dismiss must still view all

allegations in the light most favorable to the plaintiff. *See* Fed.R.Civ.P. 12(b)(6).

■■■ "[A] showing of mere motive and opportunity is insufficient to plead scienter." *Bryant,* 187 F.3d at 1287. GAAP violations, standing alone, are insufficient to create an inference of fraud. *In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 553 (6th Cir.1999); *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1208 (11th Cir. 2001). "In order to plead fraudulent accounting practices with particularity, a complaint should show facts that support the inference that the defendants recklessly disregarded the deviance from GAAP or acted with gross indifference to the misrepresentations in its financial statements. Relevant facts are the magnitude of the accounting error, whether the defendants had prior notice of the error, and whether the defendants played any role in calculating and disseminating the financial statement." *In re Scientific–Atlanta, Inc. Sec. Litig.,* 239 F.Supp.2d 1351, 1366 (N.D.Ga. 2002) (quotation omitted). "Thus, in certain circumstances, courts have held that allegations of violations of GAAP, coupled with ignoring 'red flags' or warning signs of improprieties, can be sufficient to state a claim of securities fraud." *In re Smith Gardner Sec. Litig.,* 214 F.Supp.2d 1291, 1302 (S.D.Fla.2002).

### 1. Evidence of Scienter

■■■ Plaintiffs do not offer any direct evidence of knowledge by any of the Defendants of the conduct alleged. Their allegations of scienter largely are based on inferences to be drawn from the conduct on which Plaintiffs based their securities fraud claims. Their principal argument seems to be that this conduct occurred and that its occurrence itself evidences each defendant acted with scienter. The logic is circular. A careful analysis of the conduct alleged, viewed individually and in the

aggregate, does not support sufficient circumstantial or intentional evidence of scienter based on the facts of the conduct alone.

### a. Failure to Take Reserve for Litigation Contingency

Plaintiffs claim Defendants' scienter is evident because BellSouth continued to assess late fees in Florida, "even though Defendants knew that the Final PSC Order was ultimately likely to be upheld by the Florida Supreme Court." (Pls.' Resp. at 41.) Thus, Plaintiffs claim "Defendants [sic] failure to record a reserve against the illegal late payment fees in order to inflate BellSouth's revenues demonstrates scienter." (*Id.*)

These allegations do not give rise to a finding of scienter. Plaintiffs are simply challenging the accounting judgment of the company, which is insufficient to establish scienter. *See Ziemba*, 256 F.3d at 1210 (finding when "discretion is necessarily involved," alleged GAAP violations do not establish scienter); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d at 553 ("Although Plaintiffs speculate that it is likely that Defendants knew of the GAAP violations because they occurred over a long period of time, claims of securities fraud cannot rest 'on speculation and conclusory allegations.' "); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir.2002) (finding mere publication of accounting figures that violate GAAP insufficient; "The party must know that it is publishing materially false information, or must be severely reckless in publishing such information.").

Plaintiffs seek to bolster their scienter claim by alleging Defendants were motivated to commit the fraud "to inflate BellSouth's revenues." Absent facts to support this assertion, the Court cannot, without rendering the PSLRA's pleading requirements meaningless, accept the motivation to grow reserves—one common

to most companies—as competent and substantial evidence of scienter. *See, e.g., Abrams*, 292 F.3d at 432 (finding company's need to raise capital insufficient to support finding of scienter). BellSouth's full disclosure of the Florida late fee proceedings at all relevant times further discredits that Defendants acted with scienter. *See Ziemba*, 256 F.3d at 1211 (finding "disclosures actually made by [defendant] significantly undermine any hint of fraud"); *Cutsforth v. Renschler*, 235 F.Supp.2d 1216, 1261 (M.D.Fla.2002) (finding disclosures of unfavorable information weighing against an inference of scienter). Simply put, Defendants' reasonable conduct and substantial public disclosures do not demonstrate highly unreasonable conduct which is an extreme departure from the standards of ordinary care. *See Bryant*, 187 F.3d at 1282 n. 18 (citation omitted).

### b. Failure to Write Down Latin American Goodwill

Plaintiffs also claim Defendants were motivated not to write down over a billion dollars in goodwill associated with its Latin American operating segment "[i]n order to inflate earnings and intangible assets." (Pls.' Resp. at 42.) Plaintiffs claim Defendants' scienter is evidenced by its violation of GAAP in not timely performing an impairment review, and by putting its application to offer a Latin American tracking stock on hold for over two years, ultimately cancelling it. (*Id.*)

Plaintiffs have alleged that BellSouth should have performed an impairment review before it actually did, and had it done so it would have written down its goodwill well before July 2002. Plaintiffs' claim essentially is that GAAP was violated. They further allege that the company's public filings assured the public impairment reviews would be done when conditions warranted them. The allegation that

Defendants should have written down goodwill earlier is not, alone, sufficient to give rise to a strong inference of scienter on the part of all of the Defendants so as to support a securities violation. *See In re K–tel Int'l, Inc. Sec. Litig.,* 300 F.3d at 891 (finding failure to take a write-off earlier insufficient to plead Rule 10b–5 violation).[23] Plaintiffs have, however, alleged that there was significant general turmoil in a broad region of the world. Defendants themselves acknowledge the troubling adverse economic and political turmoil in Latin America and that it could affect BellSouth's business. A credible argument can be made that this should have triggered a review of the value of the goodwill. However, these facts, while possibly sufficient to support a claim based on negligence, do not alone demonstrate an "extreme departure from the standards of ordinary care," sufficient alone to establish scienter on the part of the Defendants.[24] *See Cutsforth,* 235 F.Supp.2d at 1260 (noting that accountants might reasonably reach different conclusions about application of FAS 121; "FAS 121 does not set forth some bright-line test, but rather states guidelines that call for the exercise of accounting judgment."); *Acito v. IMC-ERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir. 1995) (holding pre-PSLRA that "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud"); *In re Comshare, Inc. Sec. Litig.,* 183 F.3d at 553 (same); *Abrams,* 292 F.3d at 433 (finding nature of accounting problems here "can easily arise from negli-

gence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). That Defendants generally disclosed the troubles in its Latin American operations urges against an across the board inference of scienter, as does the fact that Defendants, and not some outside entity, initiated the inquiry into the impairment of the goodwill that resulted in the write down.

Plaintiffs also contend that BellSouth's scienter can be inferred from its decision to put its application to offer a Latin American tracking stock on hold for two years. Plaintiffs' suggestion that this delay evidences that one or more of the Defendants knew it would be a fraud not to quantify and disclose a degradation of Latin American goodwill is, at best, conjecture and, alone, does not provide a sufficient basis to infer scienter. On these facts, Plaintiffs have not offered sufficient allegations to demonstrate scienter regarding the goodwill claim. *See DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) ("Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud."); *Cutsforth,* 235 F.Supp.2d at 1261 (noting Plaintiffs' lack of cogent explanation why Defendant simply delayed the write-down until later that year and finding disclosures of unfavorable information pointing against an inference of scienter).

---

**23.** Plaintiffs have also failed to allege the amount of goodwill that was impaired and would have been discovered by an earlier review of goodwill prior to the change to FAS 142. In fact, of the $1.277 billion write-down of goodwill alleged in the complaint, Plaintiffs admit that nearly a billion of it may not have been impairment but rather a result of the accounting change. (Pls.' Resp. at 12 n. 10

("a portion of the Company's write-down is attributable to the Company's adoption of FAS 142").)

**24.** *See also* Section III.C.2, *infra,* for further analysis of motive and opportunity on the part of the Individual Defendants in relation to the facts alleged by Plaintiffs regarding the Latin American goodwill issue.

### c. *Failure to Timely Adopt SAB 101*

Plaintiffs claim BellSouth "manipulate[d] revenues and earnings" by not instituting a change to SAB 101 and the deferral method for accounting until January 1, 2003, for the publishing of its directories. (Pls.' Resp. at 39.) Plaintiffs contend "BellSouth's write-down *de facto* admits that BellSouth did not timely adopt SAB 101 as mandated by the accounting literature. Tellingly, BellSouth had applied SAB 101 to its service activation fees beginning in 2000. Accordingly, Defendants' failure to timely adopt SAB 101 for its advertising and publishing revenues is highly indicative of scienter." (*Id.* at 40 (citations omitted).)

These allegations do not give rise to a strong inference of scienter. Plaintiffs essentially base their scienter argument on their disagreement with the company's accounting methods. It is well settled that allegations of GAAP alone are not sufficient to allege scienter. *See Malin v. Ivax Corp.*, 17 F.Supp.2d 1345, 1360 (S.D.Fla. 1998) ("Plaintiffs essentially offer only two concrete facts underlying their allegations of scienter: (1) Defendants had a motive and opportunity to commit the fraud; and (2) Defendants' failure to disclose was in violation of GAAP. Even taken together, these allegations are insufficient."). In the absence of "red flags" suggesting defendants' application of SAB 101 to its directory revenues was fraudulent, Plaintiffs fail to present sufficient allegations of fraud to meet the scienter element on this claim.

### d. *Overstatement of Unbilled Receivables, Understatement of Bad Debt, and Overbilling Practices*

Plaintiffs also point to several other allegations to demonstrate that Defendants acted with scienter. First, Plaintiffs claim that Defendants must have been aware, well before April 2002, that its unbilled receivables were overstated by $163 million, because customers were questioning their billed amounts during collection calls made by the company.

Plaintiffs have failed to connect any of this conduct alleged to upper-level management or the company itself. Plaintiffs' claim that customer statements made during collection calls were communicated to and raised a "red flag" with management is not credible. As the Eleventh Circuit stated in *Ziemba*, there are no " 'tips,' letters or conversations raising inferences" that the company knew about the fraud or was severely reckless in not knowing about the fraud. *Ziemba*, 256 F.3d at 1210. In short, no reasonable person could find that statements made by customers in this situation would raise "red flags" with those responsible for preparing the financial statements.[25] *See In re Comshare, Inc. Sec. Litig.*, 183 F.3d at 553 (finding plaintiffs' conclusory allegations of knowledge or reckless indifference insufficient because plaintiffs "allege no facts to show that Defendants knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did"); *In re Suprema Specialties, Inc. Sec. Litig.*, 334 F.Supp.2d 637, 655–56 (D.N.J. 2004) (refusing to infer scienter of upper-level management from admissions of former employees and others of improper practices; "Plaintiffs have not alleged such specific circumstances where [upper-level management] had access to and received information about the fraudulent transactions."); *see also Barr v. Matria Healthcare, Inc.*, 324 F.Supp.2d 1369, 1384 (N.D.Ga.2004) ("Failure to establish adequate reserves is considered corporate mismanagement and, as such, is insuffi-

---

**25.** The Court also notes that BellSouth's lack of scienter is indicated by the fact it discovered and on its own initiative disclosed these errors.

cient to establish securities fraud.... [T]he Defendants' failure to establish bad debt reserves ... does not state a federal securities claim, and dismissal of the claim is warranted.")

Second, Plaintiffs claim: "Through impossible sales targets and a lack of internal controls, BellSouth ... knowingly and/or recklessly exposed its revenues to improper manipulation by a stressed and revenue-target-driven sales force, and its customers to improperly billed services and overstated invoices." (Pls.' Resp. at 39; Compl. ¶¶ 100–108.) Plaintiffs' conclusory and factually unsupported allegations, assuming they are true, that Defendants must have or should have been aware of these practices and permitted them to occur because of the lack of internal controls cannot support an inference of scienter. *See In re Comshare, Inc. Sec. Litig.*, 183 F.3d at 553; *see also Acito*, 47 F.3d at 53 (noting company's deficiencies, but holding "[i]t is well settled that section 10(b) was not designed to regulate corporate mismanagement."); *Abrams*, 292 F.3d at 432 (noting nature of accounting problems here "can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action").

Third, Plaintiffs allege that Defendants' scienter is evidenced by their overbilling of customers. Plaintiffs rely on the Supra arbitration tribunal's finding that Bell-South breached its agreement with Supra "with the tortious intent to harm Supra ...," (Compl. ¶ 45,) and that BellSouth continued to bill Supra improperly. (*Id.* ¶ 51.) Plaintiffs also allege that "[t]he complexity of BellSouth's bills, which makes them difficult to challenge, also strongly implies an intentional practice." (Pls.' Resp. at 37.)[26] These broad, conclu-

sory allegations do not give rise to an inference of scienter. "Tortious intent" or difficult to understand billing documents, or these allegations taken as a whole, do not show highly unreasonable conduct which is an extreme departure from the standards of ordinary care, and fail to demonstrate Defendants acted with scienter. Because Plaintiffs have failed to plead facts that show that any of the alleged errors or improprieties should have been obvious to BellSouth, were challenged by any auditors, or that BellSouth disregarded red flags that would have revealed the errors or improprieties to those responsible for preparing financial statements prior to the company's issuance of public filings, the Court finds that Plaintiffs have failed to allege facts that give rise to a strong inference of scienter.

### 2. *Motive and Opportunity Demonstrating Scienter*

Plaintiffs also allege that Defendants' motive and opportunity, independently or when coupled with Defendants' alleged GAAP violations, "adequately give rise to a strong inference of scienter." (Pls.' Resp. at 44.) The company's motive and opportunity is, Plaintiffs allege, evidenced by: (1) Plaintiffs' claim BellSouth's desire to raise $2.75 billion in the public sector in October 2001 to repay outstanding commercial paper obligations provided incentive to artificially increase the price of BellSouth stock, (2) Plaintiffs' claim Bell-South's incentive-based compensation provided motivation to manipulate revenues, and "contributes to a finding of scienter," and (3) Plaintiffs' claim Defendants were motivated by their desire to reap substantial rewards from insider trading and that the scope of their trading creates a strong inference of scienter.

---

**26.** Plaintiffs cite to a complaint filed against BellSouth in an unrelated arbitration as an example of overbilling. The Court does not find these allegations reliable or material to the instant analysis. (*See* Compl. ¶ 66.)

### a. Desire to Raise Capital

■ Plaintiffs claim Defendants desire to raise capital in an October 24, 2001 offering (the "October 24, 2001 offering") demonstrates the Defendants acted with scienter in making the misstatements or omissions alleged. Specifically, Plaintiffs claim the GAAP violations alleged facilitated BellSouth's sale of notes pursuant to "a Registration Statement and prospectus filed with the SEC." (Compl. ¶ 27.) Plaintiffs allege "The terms of the offering would have been negatively and materially affected had the market known the truth regarding BellSouth's scheme of aggressive and improper billing and accounting manipulations in violation of GAAP...." (*Id.*) Plaintiffs do not allege which of the aggressive or improper billing practices or GAAP manipulations alleged were implicated in the October 24, 2001 offering, or how they impacted the offering. They rely instead on the unspecific, conclusory assertion that "the terms of the offering would have been negatively and materially affected had the market known the truth" regarding BellSouth's conduct. These broad, conclusory allegations are insufficient to raise an inference of scienter. Significantly absent is an allegation that any of the misrepresentations or omissions alleged were motivated by a desire on the part of any defendant to affect the October 24, 2001 offering. BellSouth's alleged desire to boost its stock price to raise money in the capital markets cannot give rise to an inference of scienter absent other circumstances. *See Cutsforth,* 235 F.Supp.2d at 1250 ("It would virtually always be true that a company would derive some economic benefit from a higher stock price. Consequently, an allegation of a motive similar to the one asserted here has been rejected as insufficient.").

### b. Incentive Compensation

Plaintiffs make broad, conclusory allegations that Defendants' compensation was, in part, based on annual incentive awards and long-term compensation. (Pls.' Resp. at 45.) Plaintiffs assert, based on this compensation arrangement, that "Defendants' desire to inflate revenues in order to maximize their compensation contributes to a finding of scienter." (*Id.*) There is no allegation to show how the misrepresentation and omissions alleged impacted the incentive compensation any Defendant received. These conclusory assertions simply do not present a credible basis for inferring scienter. Incentive based compensation also does not give rise to a finding of scienter in this case. As the Second Circuit stated:

> Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. Incentive compensation can hardly be the basis on which an allegation of fraud is predicated.

*Acito,* 47 F.3d at 54 (quotation omitted).

### c. Insider Trading

■ Plaintiffs next claim numerous instances of suspicious trading activity on the part of certain individual Defendants demonstrate scienter. Specifically, Plaintiffs claim "The timing of the sales of Ackerman and Dykes is especially suspicious when analyzed in light of the FASB's release of FAS 142, which superseded FAS 121. FAS 142 was published in June of 2001, and became effective for the fiscal year beginning after December 15, 2001." (Pls.' Resp. at 47.) [27]

---

**27.** Plaintiffs also claim "Defendant Dykes and

Shannon sold more than $6.2 million worth

Plaintiffs' argument appears to be that Defendants Dykes, Anderson, Coe and Ackerman were aware of the deteriorating conditions in Latin America, that these circumstances necessarily were eroding the company's goodwill in the region and should have triggered a review for impairment, and in anticipation of having to disclose a significant restatement of this goodwill, they sold significant shares of the stock in the several months before FAS 142 went into effect and before the restatement was made.[28] The timing and scope of these sales, the facts alleged regarding events in Latin America, the company's assurances regarding impairment reviews being conducted when circumstances warrant them, the decision not to offer the tracking stock, the significance and circumstances of the restatement and its timing, raise a sufficient inference that Defendants acted with scienter when making the misstatements and omissions alleged. *See, e.g., In re AFC Enters., Inc. Sec. Litig.,* 348 F.Supp.2d at 1375.

Plaintiffs have not presented any facts demonstrating Defendants intended to mislead the market or were severely reckless in doing so, except with respect to

their claim based on Latin American goodwill. Consequently, Plaintiffs have not met their burden under the PSLRA to demonstrate specific facts giving rise to a strong inference of scienter for the alleged material misstatements or omissions, other than that based on the Latin American goodwill. Accordingly, Plaintiffs' Exchange Act claims, other than that based on Latin American goodwill, must be dismissed on this basis.

### C. *Control Person Claims*

Defendants move to dismiss the control person claims, under Section 20 of the Exchange Act and Section 15 of the Securities Act, on the basis that Plaintiffs have failed to plead an underlying violation. In light of the preceding discussion, Plaintiffs have failed to adequately plead a Section 20 claim except for that based on Latin American goodwill, but have sufficiently pleaded a Section 15 claim as to those claims based on the write down of Latin American goodwill, failure to timely adopt SAB 101 with respect to publishing revenues, overstatement of unbilled publishing receivables, and overbilling of CLECs. *See Theoharous,* 256 F.3d at 1227.

---

of BellSouth stock while overseeing the recognition of both CLEC revenue and advertising and publishing revenues." (*Id.* at 48.) Plaintiffs' allegation regarding the sales it alleges are associated with the CLEC charges and publishing operation are too conclusory and lack sufficient temporal connection to these issues to infer the presence of scienter. *See In re K-tel Int'l, Inc. Sec. Litig.,* 300 F.3d at 895 ("Here, however, the Class alleged only conclusory statements that the insider sales were unusual or suspicious. Such conclusory and speculative allegations are insufficient."); *In re Theragenics Corp. Sec. Litig.,* 105 F.Supp.2d 1342, 1361 (N.D.Ga.2000) (noting there are many reasons for sale of stock and the "Court refuses to simply assume that these sales were the product of fraudulent intent"); *In re Smith Gardner Sec. Litig.,* 214 F.Supp.2d at 1304 (finding stock sales not probative of scienter because, *inter alia,* plain-

tiffs fail to provide trading history for each defendant); *Acito,* 47 F.3d at 54 (noting failure to establish "unusual" sales).

**28.** FAS 142, which superceded FAS 121, went into effect for the fiscal year beginning after December 15, 2001. Plaintiffs' most significant allegations of insider trading allege that Defendant Dykes sold over $5 million worth of shares in November 2001, insider Anderson sold over $1.5 million worth of shares on September 18, 2001, insider Coe sold shares on July 19, November 18 and November 19, 2001, for proceeds over $7 million, and Defendant Ackerman sold over $4 million worth of shares in January 2002. Plaintiffs claim each of these insiders "had constructive, if not actual, knowledge of the new accounting pronouncement, and its particular effect on BellSouth." (Pls.' Resp. at 47–48.)

## IV. CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that Plaintiffs' Exchange Act claims, Counts I and II, are **DISMISSED** except that based on the write down of Latin American goodwill. Plaintiffs' claims under Counts III, IV and V are **DISMISSED** except for those based on the write down of Latin American goodwill, failure to timely adopt SAB 101 with respect to publishing revenues, overstatement of unbilled publishing receivables, and overbilling of CLECs.

**SO ORDERED,** this 8th day of February, 2005.